ACCEPTED
03-15-00226-CV
6056931
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/14/2015 12:54:37 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00226-CV**

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

7/14/2015 12:54:37 PM

JEFFREY D. KYLE
Clerk

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

LINDA PUGLISI,

*Appellee.*

_____

On Appeal From
The 53rd Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-000381
The Honorable Judge Gisela D. Trianna

_____

**BRIEF OF APPELLEE**

_____

MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
T: 512.458.5800
F: 512.458.5850
moconnell458@gmail.com

*Attorney for Appellee*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................i

TABLE OF AUTHORITIES ................................................................................. iii

ISSUES PRESENTED............................................................................................x

LEGAL FRAMEWORK OF THE MEDICAID PROGRAM ...................................2

STATEMENT OF FACTS ......................................................................................4

SUMMARY OF THE ARGUMENT .......................................................................9

ARGUMENT .......................................................................................................11

    A.   The Trial Court Correctly Denied HHSC's Motion to Dismiss .................11

    B.   The Trial Court Correctly Reversed and Remanded the Case
        to HHSC for Further Proceedings Consistent with Its Decision ...............16

    C.   Deference is Not Owed to HHSC's Post-Hoc Interpretation of
        Agency Rules ...........................................................................................18

    D.   The Trial Court Correctly Determined that HHSC's Hearing
        Decision Fails to Comply with Medicaid Law ..........................................20

    E.   The Trial Court Correctly Determined that HHSC's Hearing
        Decision is Arbitrary, Capricious, Unreasonable and
        Unsupported by Substantial Evidence .......................................................22

        1.   The trial court properly addressed the two reasons
            Molina denied Linda Puglisi's prior authorization request................22

        2.   HHSC failed to address Linda Puglisi's medical need for
            a custom power wheelchair with integrated standing
            feature...........................................................................................24

        3.   HHSC failed to employ the correct test for determining
            Medicaid coverage of DME..........................................................34

F.  HHSC Violated Linda Puglisi's Procedural Due Process
    Rights ........................................................................................45

    1.  Medicaid beneficiaries have a protected property interest
        in their Medicaid benefits ...................................................45

    2.  Molina's denial notice does not comport with due
        process and HHSC failed to address this issue ...................47

    3.  HHSC's administrative review does not comport with
        State law and further compounded the due process
        violations in this case ........................................................49

PRAYER ..............................................................................................49

CERTIFICATE OF COMPLIANCE......................................................50

CERTIFICATE OF SERVICE .............................................................51

# TABLE OF AUTHORITIES

## CASES

*Ability Center of Toledo v. Lumpkin*,
    808 F.Supp.2d.1003 (N.D. Ohio 2011) ............................................................46

*Allegent Health v. Amer. Farm Ins., Inc.*,
    656 N.W.2d 906 (Neb. 2003) ......................................................................12

*Alvarez v. Betlach*,
    572 F. App'x 519 (9th Cir.) ..........................................................................36

*Baker v. Commonwealth of Pa. Dept. of Pub. Welfare*,
    502 A.2d 318 (Pa. Commw. 1985) ..........................................................36, 37

*Bell v. Agency for Health Care Admin.*,
    768 So.2d 1203 (FL. App. 2000) ..............................................................36, 37

*Blue v. Bonta*,
    99 Cal.App. 4th 980, 121 Cal.Rptr.2d 483 (Cal App. 2002) ...........................36

*Bowers v. Thompson*;
    No. 89-2-00553-8 (Wash. Super. Ct. Thurston County Oct. 15, 1990) .......36, 37

*Brisson v. Dep't of Social Welf.*,
    702 A.2d 405 (VT. 1997) ..........................................................................36, 37

*Bristol v. R.I. Dept. of Hum. Serv.*,
    1997 WL 839884 (R.I. Super. Jan. 30, 1997) ..............................................36

*Combs v. Entertainment Publications, Inc.*,
    292 S.W. 3d 712 (Tex. App.—Austin 2009, no pet.) ......................................42

*Davis v. Shah*,
    2012 WL 1574944 (W.D.N.Y. May 3, 2012) ................................................36

*Davis v. Shrader*,
    687 N.E.2d 370 (Ind. App. 1997) ............................................................36, 37

*DeSario v. Thomas*,
  139 F.3d 80 (2d Cir. 1998) ...............................................................37

*Detgen v. Janek*,
  945 F. Supp. 2d 746 (N.D. Tex. 2013) ..............................................23

*Detgen v. Janek*,
  752 F. 3d 627 (5th Circuit 2014) ..........................................35, 36, 37

*El Paso Hosp. Dist. v. Texas Health and Human Servs. Comm'n*,
  247 S.W. 3d 709 (Tex. 2008) ..............................................................43

*Evanston Hosp. v. Hauck*,
  1992 WL 205900 (N.D. Ill. 1992) ......................................................12

*Fishman v. Daines*,
  743 F.Supp.2d. 127 (E.D. N.Y 2010) .................................................46

*Frank v. Thomas*,
  No. 3:98CV00306(GLG), U.S. Dist. Ct., D. Conn. 1998...................15

*Fred C. v. Texas Health & Human Services Comm'n*,
  988 F.Supp. 1032 (W.D.Tx. 1997) .....................................................36

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)............................................................................45

*Gray Panthers v. Schweiker*,
  652 F. 2d 146 (D.C. Cir. 1980)...........................................................47

*Hamby v. Neel*,
  368 F.3d. 549 (6th Cir. 2004) .......................................................45, 46

*Hiltibran v. Levy*,
  793 F.Supp.2d 1108 (W.D. Mo. 2011) ...............................................36

*Hunter v. Chiles*,
  944 F.Supp. 914 (S.D. Fl. 1996)....................................................36, 37

iv

*Jasset v. R.I. Dept. of Hum. Serv.*,
   2006 WL 2169891 (R.I. Super. July 31, 2006) ....................................................36

*Johnson v. Guhl*,
   91 F.Supp. 2d 754 (D. N.J. 2000)....................................................................46

*Johnson v. Minn. Dept. of Human Serv.*,
   565 N.W.2d 453 (Minn. App. 1997) ...........................................................36, 37

*Jonathan C. v. Hawkins*,
   2006 WL 3498494 (E.D. Tex. Dec. 5, 2006) ....................................................45

*Koenning v. Janek*,
   539 Fed. Appx. 353 (5th Cir. 2013)..................................................................39

*Koenning v. Suehs*,
   897 F. Supp.2d 528 (S.D. 2012) .......................................................................39

*Ladd v. Thomas*,
   962 F. Supp 284 (D. Conn. 1997)................................................................45, 46

*Lankford v. Sherman*,
   451 F.3d 496 (8th Cir. 2006) .................................................................34, 36, 37

*Ledet v. Fischer*,
   638 F. Supp. 1288 (M.D. La. 1986)..............................................................36, 37

*Liberty Mut. Ins. Co. v. Texas Dep't of Ins.*,
   187 S.W. 3d 808 (Tex. App. Austin 2006, pet denied) .....................................46

*Mayhew v. Town of Sunnyvale*,
   964 S.W.2d 922 (Tex.1998).............................................................................11

*Meyers v. Reagen*,
   776 F.2d 241 (8th Cir. 1985) ...........................................................................36

*Myers v. State of Mississippi*,
   3:95 CV 185 LN (Slip Op. S.D. Miss. 1995) ..............................................36, 37

*Neuwrith v. Louisiana State Bd. of Dentistry*,
  845 F. 2d 553 (5th Cir. 1988) ...............................................................46

*Ohlson v. Weil*,
  953 P.2d 939 (Colo. App. 1997).......................................................36, 37

*Patterson v. Planned Parenthood of Houston & Se. Texas, Inc.*,
  971 S.W.2d 439 (Tex. 1998) ...............................................................11

*Perry v. Del Rio*,
  66 S.W.3d 239 (Tex. 2001)..................................................................16

*Public Utility Commission v. South Plains Electric Cooperative, Inc.*,
  635 S.W.2d 954 (Tex.App.—Austin 1982, writ ref'd n.r.e.) ..............................44

*Rastetter v. Weinberger*,
  379 F.Supp. 170 (D.AZ. 1974) ............................................................12

*Rodriguez v. Serv. Lloyds Ins. Co.*,
  997 S.W.2d 248 (Tex. 1999) ..........................................................21, 43

*Roe v. Norton*,
  522 F.2d 928 (2d Cir. 1975) ..............................................................12

*Skubel v. Fuoroli*,
  113 F.3d 330 (2d Cir. 1997) ..............................................................12

*Slekis v. Thomas*,
  525 U.S. 1098 (1999).......................................................................38

*Stanford v. Butler*,
  181 S.W.2d 269 (Tex.1944).................................................................19

*Sw. Pharmacy Solutions, Inc. v. Texas Health & Human Servs. Comm'n,*
  408 S.W.3d 549 (Tex. App. 2013).........................................................18

*Tarrant Appraisal Dist. v. Moore*,
  845 S.W.2d 820 (Tex. 1993) ..............................................................19

*Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.*,
   997 S.W.2d 651 (Tex. App.—Austin 1999, pet. dism'd w.o.j.).........................41

*Texas State Bd. of Pharmacy v. Witcher*,
   447 S.W.3d 520 (Tex. App. 2014)....................................................................43

*Thompson v. Roob*,
   2006 WL 2990426 (S.D. Ind. Oct. 19, 2006) ..............................................45, 48

*T.L. v. Colorado Dept. of Health Care Policy & Fin.*,
   42 P.2d 63 (Colo. App. 2002) .......................................................................36

*Waco Indep. Sch. Dist. v. Gibson*,
   22 S.W.3d 849 (Tex. 2000).............................................................................11

*Weaver v. Reagan*,
   886 F. 2d 194 (8th Cir. 1989) .......................................................................25

*Wilder v. Virginia Hospital Association*,
   496 U.S. 498 (1990)..........................................................................................2

*Will T. v. Taylor*,
   465 F.Supp.2d 1267 (N.D. Ga. 2000)............................................................36

*Woody v. Dallas*,
   809 F. Supp. 466 (N.D. Tex. 1992) ...............................................................46

## REGULATIONS

1 TEX. ADMIN. CODE § 354.1031 ..................................................................20, 39

1 TEX. ADMIN. CODE § 354.1031(b)(12)..........................................................3, 20

1 TEX. ADMIN. CODE § 354.1035 ..............................................................20, 21, 39

1 TEX. ADMIN. CODE § 354.1039 ..............................................................20, 21, 29

1 TEX. ADMIN. CODE § 354.1039(a) .............................................................18, 19

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1039(a)(4)(A) .......................................................18, 19

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1039(a)(4)(D) ..............................................4, 20, 24, 38

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1040 ......................................... 13, 20, 21, 39, 40, 42

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1040(d)(3) .......................................................13

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1040(g) .......................................................13

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1041 .......................................................12

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.1041(2)(B) .......................................................13

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.2321(b) .......................................................14

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 354.2321(f) .......................................................14

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 355.8021(b)(2-3) .......................................................13

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 357.3(b)(1)(E) .................................................46, 47

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 357.9 .......................................................27

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 357.703 .......................................................8

1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ § 357.703(b)(3).......................................................42

42 C.F.R. § 431.10(e)(1) .......................................................2

42 C.F.R. § 200 .......................................................47

42 C.F.R. § 431.210(b) .......................................................31, 47

42 C.F.R. § 431.210(c).......................................................18, 31, 47

42 C.F.R. § 435.930 .......................................................4

42 C.F.R. § 438.210(a)(4)(i) .......................................................28

42 C.F.R. § 438.404 ............................................................................47

42 C.F.R. § 440.70(b)(3) ......................................................................3

42 C.F.R. § 440.230(b) ...............................................................3, 38, 44

42 C.F.R. § 440.230(c) ...............................................................3, 38, 44

42 C.F.R. § 440.240(a) ......................................................................34

## STATUTES

42 U.S.C. § 1396 ..............................................................................2

42 U.S.C. § 1396a(a)(3) ....................................................................47

42 U.S.C. § 1396a(a)(5) ......................................................................2

42 U.S.C. § 1396a(a)(8) ......................................................................4

42 U.S.C. § 1396a(a)(10(B) ................................................................34

42 U.S.C. § 1396a(a)(17) ............................................................3, 38, 44

42 U.S.C. § 1396d(a)(7) ......................................................................3

42 U.S.C. § 1396w2 ............................................................................2

42 U.S.C. § 1396-1 ............................................................................2

TEX. GOV'T CODE § 531.019(c) ..........................................................1, 8

TEX. GOV'T CODE § 531.021(a) ............................................................2

TEX. GOV'T CODE § 2001.003(6) ........................................................41

TEX. GOV'T CODE § 2001.023 ............................................................43

TEX. GOV'T CODE § 2001.030.................................................................43

TEX. GOV'T CODE § 2001.038..............................................................39, 40

TEX. GOV'T CODE § 2001.171...................................................................1

TEX. HUM. RES. CODE § 32.0425 ....................................................19, 40, 42

## OTHER AUTHORITIES

*In the Matter of Mary A.*, New York Dept. of Social Services................................14

RESNA Position on the Application of Wheelchair Standing Devices,
*Assistive Technology,* 21:161-168, 2009 ..................................................6

# ISSUES PRESENTED

1. Did the trial court correctly deny HHSC's motion to dismiss?

2. Did the trial court correctly reverse and remand the case to HHSC for further proceedings consistent with the court's decision?

3. Did the trial court correctly determine that HHSC's post hoc interpretation of agency rules is not entitled to deference?

4. Did the trial court correctly determine that HHSC's hearing decision fails to comply with Medicaid law?

5. Did the trial court correctly determine that HHSC's hearing decision is arbitrary, capricious, unreasonable and unsupported by substantial evidence?

6. Did HHSC violate Linda Puglisi's procedural due process rights as a Medicaid beneficiary?

No. 03-15-00226-CV

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*

v.

LINDA PUGLISI,

*Appellee.*

_____

On Appeal From
The 53rd Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-000381
The Honorable Judge Gisela D. Trianna

_____

**BRIEF OF APPELLEE**

_____

To the Honorable Third Court of Appeals:

This appeal arises out of a Medicaid hearing decision issued by the Texas

Health and Human Services Commission (HHSC) denying Linda Puglisi's request

for Medicaid prior authorization of a custom power wheelchair with integrated

standing feature. Linda filed a Petition for Judicial Review in the Travis County

District Court to challenge this denial. TEX. GOV'T CODE §§ 531.019(c) and

2001.171 *et seq.* The trial court reversed the agency's decision, finding it arbitrary,

capricious, unreasonable, and unsupported by substantial evidence. The trial court's decision should be affirmed.

## LEGAL FRAMEWORK OF THE MEDICAID PROGRAM

In 1965, Congress enacted Title XIX of the Social Security Act to establish Medicaid, a federal-state program designed to provide medically necessary health care to low income families and individuals with disabilities. 42 U.S.C. §§ 1396-1396w2. The purpose of this program is to enable states "to furnish…rehabilitation and other services to help such families and individuals attain or retain the capability for independence or self-care." 42 U.S.C. § 1396-1. State participation in Medicaid is optional, however, "once a state chooses to join, it must follow the requirements set forth in the Medicaid Act and its implementing regulations." *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 502 (1990).

The Centers for Medicare and Medicaid Services (CMS) provide federal oversight of state Medicaid programs, however, each state must designate a single state agency to administer its Medicaid program. 42 U.S.C. § 1396a(a)(5). HHSC is the designated Medicaid agency in Texas. TEX. GOV'T CODE § 531.021(a). As the single state agency, HHSC must comply with all federal Medicaid requirements when promulgating rules and establishing policy and cannot delegate its authority on program matters to its contracted entities. 42 C.F.R. § 431.10(e)(1). HHSC's contracted entities, which include managed care organizations and the

2

Texas Medicaid and Healthcare Partnership (TMHP), must comply with all Medicaid legal requirements when deciding whether requested medical services will be approved for eligible beneficiaries.

At issue in this case is medical equipment, a required component of the Medicaid home health category of service. 42 U.S.C. § 1396d(a)(7); 42 C.F.R. § 440.70(b)(3). Federal law does not presently define the term durable medical equipment (DME), however, the Health Care Financing Administration (now CMS) issued official guidance in 1998 concerning this mandatory Medicaid benefit. HHSC App. 6. Known as the *DeSario* Letter, this guidance clarified that state Medicaid programs must comply with the Medicaid Act's reasonable standards requirement, 42 U.S.C. § 1396a(a)(17), and amount duration, and scope rule, 42 C.F.R. § 440.230(b-c), in administering the DME benefit. In 2013, CMS reaffirmed the continuing application of this federal policy when it wrote to HHSC's Medicaid Director to explain that Texas Medicaid must provide DME when the requested item: (1) is a covered benefit; and (2) is medically necessary for the individual requesting it. Puglisi App. 1.

An item of medical equipment is covered by Medicaid if it meet HHSC's definition of DME. Puglisi App. 1. By rule, 1 TEX. ADMIN. CODE § 354.1031(b)(12), DME is defined as:

3

[m]achinery or equipment which meets one or both of the following criteria: (A) the projected term of use is more than one year; or (B) reimbursement is made at a cost of more than $ 1,000.

Texas Medicaid policy, TMPPM DME Handbook 2.2.2, further defines DME as:

Medical equipment or appliances that are manufactured to withstand repeated use, ordered by a physician for use in the home, and required to correct or ameliorate a client's disability, condition or illness.

HHSC App. 4, 5.

An item of DME is medically necessary when "required to correct or ameliorate the individual's disability, medical condition, or illness" or in exceptional circumstances, found to "serve a specific medical purpose." TMPPM DME Handbook 2.2.2; 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D). HHSC App. 4, 5. Once these criteria - coverage and medical necessity - are met by an eligible beneficiary, HHSC or its contracted entity must prior authorize the requested item of DME with reasonable promptness. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930.

## STATEMENT OF FACTS

The facts underlying Linda Puglisi's request for Medicaid prior authorization of a custom power wheelchair with integrated standing feature were largely uncontested at HHSC's hearing. In 2011, Linda sustained a C1-4 spinal cord injury during surgery to remove a tumor from her neck. Puglisi App. 2, p.50. This injury left her paralyzed, dependent upon a ventilator to breathe and a feeding

4

tube for sustenance. Following months of hospitalization and inpatient rehabilitation, the ventilator and feeding tube were discontinued. Linda remained paralyzed however, and is no longer able to walk. She requires a custom power wheelchair for all mobility. Puglisi App. 2, p. 50; App. 3, pp. 63-64; AR 310.

In February 2013, Linda was admitted to TIRR Memorial Hermann Hospital for physical rehabilitation. While there, she underwent a comprehensive wheelchair assessment, which provides extensive information concerning her disability and the numerous medical conditions she faces as a result. Puglisi App. 3, pp. 63-71: HHSC App. 2, Finding of Fact 3; App. 3, Finding of Fact 4. This evaluation explains that Linda has "impaired integumentary sensation, respiratory function, neurogenic bowel, and neurological pain." She also faces an "increased risk for bone density loss and compromised soft tissue integrity secondary [due] to not being able to bear weight through [her bilateral lower extremities]." Puglisi App. 3, p. 64.

The evaluation team recommended a custom power wheelchair with integrated standing feature to address Linda's many medical conditions and to allow her to "independently perform pressure relief and weight bearing through her [lower extremities] preventing skin breakdown and bone density loss, as well as enhancing biomechanical alignment throughout the entire body on a daily basis,

which helps to prevent further impact of spasticity on joints in upright postures."[1] Puglisi App. 3, p. 68-69. Linda's attending physical medicine and rehabilitation specialist attested to her medical need for the recommended wheelchair with standing feature.[2]

As required, a Medicaid-enrolled DME supplier requested prior authorization of the recommended wheelchair from Molina Healthcare of Texas (Molina), a managed care organization under contract with HHSC. HHSC App. 2, Findings of Fact 1, 4; App.3, Findings of Fact 1,5. Molina referred the request to a third-party entity "for review of medical necessity…" HHSC App. 2, Finding of Fact 5. This reviewer informed the DME supplier that it would have to substitute a different wheelchair base and remove the seat elevator and standing feature before Molina would approve a power wheelchair for Linda. AR 132-133. In response, the DME supplier submitted extensive documentation, including several professional publications explaining the medical benefits of standing for people with spinal cord injuries and their use of wheelchairs with integrated standing

---

[1] Custom wheelchairs with integrated standing systems are well-recognized in the rehabilitation profession as a means of addressing the "painful, problematic, and costly secondary complications" that result from prolonged sitting. These wheelchairs "allow for more frequent, random, and independent performance of standing" than separate standing devices. *See* RESNA Position on the Application of Wheelchair Standing Devices, *Assistive Technology,* 21:161-168, 2009. Puglisi App. 4.

[2] The recommended wheelchair has an integrated multi-positional standing system. This wheelchair requires a Group 4 base to accommodate the standing feature and several additional power seat functions, including tilt and recline, center mount articulating elevating leg rests, stand and drive leg rest assembly, and seat elevation, all of which are required to operate the standing function. Puglisi App. 5, ¶5.

features. AR 47-117. This documentation also included additional medical justification by Linda's attending physician who further explained Linda's diagnoses and functional status, the secondary medical conditions she faces as a result of prolonged sitting (12 hours) in her wheelchair each day, her need to stand numerous times throughout the day without risk of transfer injuries, her inability to independently use a separate stander, and the underlying rationale for recommending a custom power wheelchair with integrated standing feature as the only item of equipment that will address Linda's complex medical needs.[3] Puglisi App. 2, p. 50-52. The DME supplier also explained why certain components could not be "removed" from the recommended wheelchair as requested by Molina's outside reviewer. AR 49.

On May 30, 2013, the reviewer provided his "itemized collection of thoughts on the equipment in question." He did not dispute Linda's medical conditions or refute the professional opinions of her medical providers. He acknowledged that Linda's medical providers "offered very detailed benefits of standing" and "they note that the member is unable to reap these benefits unless they have the stander on their chair... ." AR 118-119.

---

[3] There are two general types of standing devices. One is a non-mobile separate stander that requires the user to transfer in and out of the device whenever he or she needs to stand. The other is a standing feature integrated into a custom wheelchair, which allows for independent standing without assistance from care providers and the risk of transfer injuries.

On June 6, 2013, Molina denied Linda's wheelchair request, stating among other things, that the standing feature was neither covered by Medicaid nor medically necessary and the seat elevator was not medically necessary. Molina did **not** contest Linda's medical need to stand throughout the day as recommended by the evaluation team. HHSC App. 1.

A Medicaid fair hearing was requested on June 24, 2013, and was held on October 30, 2013. AR 267; 19. For the purpose of this hearing, TIRR's attending physician provided an additional letter of medical necessity explaining Linda's medical need for the recommended wheelchair and further advising that "the team responsible for conducting Linda's wheelchair evaluation in February 2013 continues to support their recommendation for a custom power wheelchair with integrated standing feature for Linda." Linda's physician also reaffirmed that a separate stander would not be effective in addressing the numerous secondary medical conditions she faces due to her spinal cord injury. Puglisi App. 6.

In November 2013, HHSC's hearing officer sustained Molina's prior authorization denial. HHSC App. 2. Linda requested an administrative review of this decision pursuant to TEX. GOV'T CODE § 531.019(c) and 1 TEX. ADMIN. CODE § 357.703. AR Tab 16, 1-14. On January 14, 2014, an HHSC attorney sustained the hearing officer's decision and upheld Molina's denial of the recommended wheelchair. HHSC App. 3. Having exhausted her administrative remedies, Linda

8

filed a Petition for Judicial Review on February 7, 2014. CR3-31. While this case was pending in the trial court, HHSC informed Linda that, effective May 2014, she would be dually eligible for both Medicaid and Medicare. This dual eligibility status is known as a Medicaid Qualified Medicare Beneficiary (MQMB). Five months later, HHSC filed a motion to dismiss, claiming the case was not ripe because of Linda's dual eligibility. CR 199. The trial court denied this motion in November 2014. CR 314. On January 15, 2015, the court reversed HHSC's hearing decision, finding that Linda was entitled to Medicaid prior authorization of the recommended wheelchair. CR 348-349.

## SUMMARY OF THE ARGUMENT

The trial court correctly determined it had subject matter jurisdiction of this case and properly denied HHSC's motion to dismiss. The facts underlying this case were ripe when it was filed and continue to be ripe today. No intervening event, including Linda's dual eligibility for Medicaid and Medicare, has rendered this case unripe for adjudication.

The trial court properly tailored its decision on the merits to HHSC's denial of Medicaid prior authorization for the recommended wheelchair and remanded the case for further action consistent with its decision. The court was not required to remand the case to allow HHSC to "change its findings and decision." Nor was the court obligated to defer to HHSC's post hoc interpretation of agency rules or to

9

consider "regulatory prerequisites" that were not identified during the administrative proceeding as the basis for Molina's denial of Linda's prior authorization request.

Molina identified two reasons for its prior authorization denial - - Medicaid coverage of the recommended standing feature and Linda's medical necessity for the standing feature and seat elevator. The first is a legal question the trial court resolved by finding that "HHSC's administrative decision fails to comply with the controlling federal and state law, and thus, is arbitrary, capricious, and unreasonable." The second is a question of fact the trial court resolved based upon the evidence submitted by Linda's treating medical providers and Molina's failure to refute this evidence. On this issue, the trial court correctly determined that HHSC's decision was not supported by substantial evidence.

At the fair hearing, Molina had the burden to prove that the reasons for denial cited in its notice of adverse action were factually accurate and legally correct, but failed to meet this burden. Like Molina, HHSC failed to employ the correct test for determining Medicaid coverage of DME and to apply the agency's own medical necessity standards established in rule and policy. Finally, Linda's due process rights as a Medical beneficiary were violated in this case, first by Molina's failure to provide legally sufficient notice, and then by HHSC's attorney

10

who based his decision on grounds that were not identified in Molina's denial notice. The trial court's decision is correct and should be affirmed.

## ARGUMENT

### A. The Trial Court Correctly Denied HHSC's Motion to Dismiss.

HHSC's claim that the trial court lacked subject matter jurisdiction has no merit. The court correctly rejected HHSC's assertion that Linda's dual eligibility for Medicaid and Medicare rendered her case unripe and properly denied the agency's motion to dismiss. While ripeness is a "threshold issue that implicates subject matter jurisdiction," *Patterson v. Planned Parenthood of Houston & Se. Texas, Inc.*, 971 S.W.2d 439, 442 (Tex. 1998) *citing Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998), there is no question this case was ripe when filed and continues to be ripe today. This case does not involve "uncertain or contingent future events that may not occur as anticipated or may not occur at all." *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851-52 (Tex. 2000). Rather, the facts of this case "have developed sufficiently so that an injury has occurred…" 439 S.W.2d at 442. (citations omitted). This injury – denial of Medicaid prior authorization of a power wheelchair with integrated standing feature – occurred prior to the filing of this action and continues to date.

Contrary to HHSC's claim, Linda's dual eligibility is not a "significant intervening event" that renders her case for *Medicaid* prior authorization unripe.

HHSC Brief, p.10. It does not matter that "Texas law requires HHSC to analyze *claims* submitted under Medicaid to ensure *claims* are submitted first under Medicare to the extent allowed by law." (emphasis added) HHSC Brief, p.9. This case is not about the payment of claims: it is about the unlawful denial of prior authorization of a Medicaid service. Medicare's primary payor status does not dictate any particular order for securing prior authorization of the recommended wheelchair.[4]

HHSC's assertion that Linda "is required to avail herself of the CMS prior authorization process and procedure in the first instance" is wrong. HHSC Brief, p. 11. HHSC does not identify any authority to support this claim and for good reason – no such requirement exists in either Medicare or Medicaid law or policy.[5] These are separate programs, enacted with distinct purposes and established with different coverage and medical necessity standards.[6]

---

[4] For dually eligible individuals, Medicare is the primary payor, while Medicaid is secondary. 1 TEX. ADMIN. CODE § 354.1041.

[5] The DME MAC Supplier Manual cited by HHSC offers **no** support for the agency's assertion that Medicare prior authorization must be obtained "in the first instance." HHSC App. 11.

[6] Numerous courts have recognized the differences between Medicaid and Medicare. *See e.g., Skubel v. Fuoroli*, 113 F.3d 330, 336 (2d Cir. 1997), *aff'g* 925 F.Supp. 930, 941(D.Conn. 1996)(rejecting reliance on Medicare regarding scope of Medicaid coverage of home health care services); *Roe v. Norton*, 522 F.2d 928, 933-34n.5 (2d Cir. 1975)(does not infer medical need is analogous between Medicare and Medicaid); *Rastetter v. Weinberger*, 379 F.Supp. 170, 172 (D.AZ. 1974)(Medicaid is a different law with a different purpose than Medicare); *Allegent Health v. Amer. Farm Ins., Inc.*, 656 N.W.2d 906, 911 (Neb. 2003)(Medicare is a program with a different purpose and different standards than Medicaid)(*citing Evanston Hosp. v. Hauck*, 1992 WL 205900 (N.D. Ill. 1992)(Medicare and Medicaid are entirely separate programs with different purposes and standards; federal Medicare enactments do not provide any mandates for state Medicaid practices.) *aff'd* 1 F.3d 540 (7th Cir. 1993), *cert. den.* 510 U.S. 1091 (1994)).

Importantly, Linda's MQMB status does not limit the Medicaid services to which she is entitled as she remains eligible for the full scope of Medicaid benefits, in addition to her Medicare benefits. If an item of DME is not available through Medicare, Medicaid remains a source for this service. 1 TEX. ADMIN. CODE §§ 354.1041(2)(B); 355.8021(b)(2-3). Moreover, Linda's MQMB status does not alter the fact that she is required to follow the same process for obtaining a custom power wheelchair through Medicaid as all other beneficiaries. A description of this process, which consists of four sequential steps, demonstrates the ripeness of Linda's case. 1 TEX. ADMIN. CODE § 354.1040.

First, a Medicaid beneficiary must undergo a clinical assessment by a licensed occupational or physical therapist and a qualified rehabilitation professional (QRP). Next, a Medicaid-enrolled DME supplier must submit a prior authorization request, including the clinical assessment, a physician's attestation of medical necessity, a detailed description of the wheeled mobility system and all medically necessary components or accessories, and any other documentation required to explain the medical necessity of the requested equipment. 1 TEX. ADMIN. CODE § 354.1040(d)(3). If prior authorization is granted, the DME supplier orders and delivers the authorized wheelchair to the beneficiary. Once the wheelchair is delivered, the DME supplier completes the final step – submission of the claim for payment. 1 TEX. ADMIN. CODE § 354.1040(g). In instances where "a

13

third party health insurer is identified, [suppliers] are required to bill the third party health insurer before submitting a claim for payment to the Commission…"[7] 1 TEX. ADMIN. CODE § 354.2321(b).

Here, HHSC's ripeness argument erroneously conflates the prior authorization step in this process, which occurs before the wheelchair is provided, with the final step, payment of the supplier's claim. This argument is not new. In a similar administrative case, New York Medicaid refused to process the DME prior authorization request of a dually-eligible beneficiary claiming she "was required to explore Medicare approval first because [Medicaid] is the payor of last resort." Rejecting this argument, the Commissioner explained:

> The issue here is a request for prior approval, not a request for payment. Although the Medical Assistance program is the payor of last resort, the question of payment is not relevant to the issue of prior approval . . . [t]he Appellant is entitled to have the Agency determine whether the walker is medically necessary, which is a separate and distinct question from the amount of Medical Assistance payment, if any.

Puglisi App. 7.

Similarly, Connecticut settled a lawsuit challenging this same practice by the state's Medicaid program, clarifying in statute that the DME prior authorization

---

[7] "The Commission may be billed for the difference between the amount paid by the third party health insurer and the Medicaid payable amount…" 1 TEX. ADMIN. CODE § 354.2321(f).

process must be available to dually eligible beneficiaries.[8]  As explained in Conn. Gen. Stat. Sec. 17b-281a, "[a]ccess to [the DME preauthorization process] shall not be denied to a recipient on the basis that a Medicare determination has not been made prior to the submission of a request for preauthorization to the commissioner."

Regardless of Linda's MQMB status, the facts underlying HHSC's unlawful denial of Medicaid prior authorization remain ripe.  Until HHSC authorizes the recommended wheelchair, Linda is unable to proceed any further in the agency's four-step process for obtaining a custom power wheelchair.  The DME supplier cannot deliver the wheelchair or request payment first from Medicare, the primary payor, and then from Medicaid, the secondary one.

On the merits of the case, the trial court correctly found that HHSC's decision sustaining Molina's prior authorization denial failed "to comply with controlling and applicable federal and state law, and thus, is arbitrary, capricious, and unreasonable."  The court properly limited its decision to this issue, stating that "[b]ecause this DME item must [be] prior authorized from Texas Medicaid, the Court reverses the administrative decision of the Texas Health and Human Services Commission on [the] prior authorization [question] presented."  HHSC

---

[8] *Frank v. Thomas,* No. 3:98CV00306(GLG), U.S. Dist. Ct., D. Conn. 1998 (class action brought by an individual with a disability who was denied Medicaid prior authorization of a standing wheelchair because of her dual eligibility status.

15

App. 10. Once HHSC issues Medicaid prior authorization, the wheelchair can be provided to Linda. Only then can the DME supplier request payment, first through Medicare and then through Medicaid.

In determining the ripeness of a case, courts may consider "the importance of the interest advanced [and] the extent of the injury…" *Perry v. Del Rio,* 66 S.W.3d 239, 251-52 (Tex. 2001), *citing* 13 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3532.1, at 130 (2d ed.1984). Here, the injury caused by HHSC's erroneous hearing decision is a harsh one. Linda first requested prior authorization of the recommended wheelchair in April 2013. During this time, she has had to rely upon a loaner wheelchair that is not customized to meet her needs. Requiring her to begin the process again, starting with a new evaluation and a new request for Medicaid prior authorization, would subject her to further delay during which time she will not have access to the medically necessary wheelchair she requires to address her many medical conditions. The facts underlying this case are ripe and the trial court's decision denying HHSC's motion to dismiss should be affirmed.

**B.  The Trial Court Correctly Reversed and Remanded the Case to HHSC for Further Proceedings Consistent with Its Decision.**

HHSC takes issue with the trial court's reversal of the agency's hearing decision and remand for agency action consistent with this decision. According to HSHC, the "REVERSAL component of the order [ ] is in conflict with the

16

'REMAND' component." HHSC Brief, p. 12. This is incorrect. The trial court was careful to consider and decide the central issue before it - whether HHSC erroneously sustained Molina's denial of Linda's prior authorization request. Having properly found that HHSC's hearing decision was "arbitrary, capricious, and unreasonable" and "unsupported by substantial evidence," the trial court correctly remanded the case for the agency to issue Medicaid prior authorization of the recommended wheelchair.

HHSC's claim that the agency should have the opportunity to take additional evidence on remand is wrong. HHSC Brief, p.13. There is no dispute that Linda became eligible for Medicare in May 2014 or that she is entitled to the full scope of benefits available through Medicaid and Medicare. Moreover, there is no law or policy that requires Medicare authorization of DME to be requested before seeking prior authorization from Medicaid. Finally, there is no question that once the recommended wheelchair has been delivered to Linda, the DME supplier must first bill Medicare before submitting a claim to Medicaid.

Linda's MQMB status has no bearing on her right to Medicaid prior authorization of the requested wheelchair. Thus, the trial court correctly rejected HHSC's request to remand the case so it could "change its findings and decision." HHSC's Brief, p.13. There are no new facts to be determined, no new legal requirements to be applied in this case. Given the express language of the court's

order, HHSC's assertion that "the trial court failed to consider Puglisi's dual eligible status in the context of the suit for judicial review" has no merit. HHSC Brief, p. 12.

## C. Deference is Not Owed to HHSC's Post-Hoc Interpretation of Agency Rules.

HHSC next maintains the trial court failed to defer to the agency's interpretation of 1 TEX. ADMIN. CODE §§ 354.1039(a) and 354.1039(a)(4)(a) in reversing its hearing decision. Again, this argument has no merit. Neither of these rules were identified by Molina as the legal basis for denying Linda's prior authorization request. HHSC App. 1. Yet, federal Medicaid regulations require the Medicaid agency or its designee to identify the "specific regulations that support…the action" in its notice of adverse action. 42 C.F.R. § 431.210(c). Similarly, neither HHSC's hearing officer nor reviewing attorney mentioned these rules, let alone cited them as the legal basis for sustaining Molina's prior authorization denial. HHSC App. 2, 3. HHSC has no credible complaint that the trial court failed to defer to the agency's interpretation of rules that were never identified as the basis for HHSC's hearing decision.

This Court's decision in *Sw. Pharmacy Solutions, Inc. v. Texas Health & Human Servs. Comm'n,* 408 S.W.3d 549 (Tex. App. 2013), review denied (Nov. 22, 2013) does not support HHSC's position. The present case is not about construction of a statute or rule that expressly excludes wheelchair standing

18

features as no such law exists. To the contrary, applicable statute and rules specifically support Medicaid coverage of this specialized component. It is only TMHP policy that states otherwise, in conflict with Texas Medicaid law. As this Court explained, "an agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language…" "We defer to an agency's interpretation of its own rules unless it is plainly erroneous or contradicts the text of the rule or underlying statute." (citations omitted) *Id.* at 557-58. *See also Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823, (Tex. 1993) *citing Stanford v. Butler,* 181 S.W.2d 269, 273 (Tex.1944).

Here, the agency's post hoc interpretation of the above-cited rules contradicts the plain language of TEX. HUM. RES. CODE § 32.0425 and 1 TEX. ADMIN. CODE § 354.1040, which broadly define custom wheelchairs to include *other complex or specialized components.* HHSC's claim that 1 TEX. ADMIN. CODE § 354.1039(a) allows the agency to exclude complex or specialized wheelchair components is wrong and is not entitled to "serious consideration" or deference by any court.

The same is true about HHSC's interpretation of 1 TEX. ADMIN. CODE § 354.1039(a)(4)(A), which requires, among other things, that DME be medically necessary. Molina did not apply either medical necessity standard established in

Medicaid rule and policy in this case. AR 326, Response to Interrogatory No. 6. Nor did HHSC's hearing officer and reviewing attorney. HHSC App. 2, 3. Nowhere does HHSC determine whether the recommended power wheelchair with all prescribed components is required "to correct or ameliorate [Linda's] disability, medical condition, or illness, 2013 TMPPM DME Handbook §2.2.2, or will "serve a specific medical purpose." 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D). The trial court's judgment that HHSC's hearing decision is arbitrary and capricious is fully supported by the administrative record in this case.

**D.    The Trial Court Correctly Determined that HHSC's Hearing Decision Fails to Comply with Medicaid Law.**

HHSC also defends its hearing decision by claiming it complies with 1 TEX. ADMIN. CODE §§ 354.1031, .1035, .1039 and .1040 but fails to explain how this is so. In fact, there is no credible support for this claim. The first rule, 1 TEX. ADMIN. CODE § 354.1031(b)(12), defines DME and governs whether an item of medical equipment is "covered" by Texas Medicaid. As explained by CMS, medical equipment satisfying the state's DME definition is "to be provided to individuals (of any age) meeting the State's medical necessity criteria." Puglisi App. 1. Yet, neither Molina nor HHSC applied the state's DME definition to the wheelchair standing feature to determine whether it is covered through the home health benefit. HHSC App. 1, 2, 3.

20

Next, 1 TEX. ADMIN. CODE § 354.1035 sets out the qualifications for home health services, only two of which - coverage and medical necessity - were identified as the basis for Molina's denial of Linda's prior authorization request. HHSC's argument to the contrary is incorrect.

Finally, both 1 TEX. ADMIN. CODE §§ 354.1039 and .1040 fully support Medicaid *coverage* of the requested wheelchair and its components, not HHSC's finding of non-coverage. These rules define custom wheelchairs available through Texas Medicaid to include "medically justified equipment" and "complex or specialized components." The application of these rules to the requested wheelchair standing feature establishes its coverage as DME. HHSC's decision to the contrary is arbitrary and capricious. *See Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 255 (Tex. 1999) (stating an agency's action will be reversed as arbitrary and capricious when the agency fails to follow "the clear, unambiguous language of its own regulation.")

HHSC's claim that Linda failed to satisfy the necessary prerequisites for prior authorization of DME is wholly unsupported by the administrative record. Moreover, the agency's suggestion that Linda is not eligible for the requested wheelchair because "the home health agency must obtain prior authorization" completely misses the point of this case. From the outset, Linda has challenged Molina's denial of *prior authorization* for the custom wheelchair recommended by

21

her treating medical providers.  The trial court correctly found Linda has established her right to Medicaid prior authorization of this wheelchair.

**E.      The Trial Court Correctly Determined that HHSC's Hearing Decision is Arbitrary, Capricious, Unreasonable and Unsupported by Substantial Evidence.**

*1.      The Trial Court Properly Addressed the Two Reasons Molina Denied Linda Puglisi's Prior Authorization Request.*

Molina's denial of Linda's prior authorization request for a custom power wheelchair with integrated standing feature raised two issues.  HHSC App. 1. The first - Medicaid coverage of the standing feature - is a legal question the trial court correctly resolved by finding that "HHSC's administrative decision fails to comply with the controlling federal and state law, and thus, is arbitrary, capricious, and unreasonable."  The second – Linda's medical need for the recommended wheelchair - is a question of fact the trial court resolved based upon the probative evidence submitted by Linda's medical providers and Molina's failure to refute this evidence.  On this issue, the trial court correctly determined that HHSC's decision was not supported by substantial evidence. HHSC App. 10, CR 348-349.

On appeal, HHSC claims the trial court failed to decide the "salient question [ ] whether Puglisi is required to satisfy all or only part of the regulatory prerequisites necessary to acquire the requested DME."  HHSC's Brief, p. 17.  This is wrong.  The trial court correctly decided the two issues raised by Molina in its

22

denial notice, addressed by Molina at the hearing, and decided in the agency's hearing decision.

HHSC's description of additional "regulatory prerequisites" is also wrong. Linda was not required to establish, nor was the trial court required to determine, that the recommended wheelchair is "reimbursable DME." As explained in *Detgen v. Janek*, 945 F. Supp. 2d 746, 758 (N.D. Tex. 2013), "claimants ought not be required to assure HHSC during the prior authorization process that [federal reimbursement] will be available for items they request." HHSC App. 12. This is particularly true given that CMS directly informed HHSC that "federal reimbursement is available to the state to the extent that [an] item is determined to be covered." Puglisi App. 1. Simply put, Medicaid reimbursement is available for medical equipment that meets the state's definition of DME.[9]

HHSC's assertion that the trial court failed to decide if there was adequate documentation of "appropriateness" is equally unpersuasive. Molina did not deny Linda's prior authorization request on this basis and HHSC did not address "appropriateness" in its decision. Clearly, the trial court was not obliged to do so either.

---

[9] Linda's undisputed evidence established that integrated standing features have been reimbursed by Texas Medicaid under the miscellaneous DME code (E1399) and the code for wheelchair standing features (E2301). *See* Declaration of Britt Sitzes, AR 289-290, ¶4; Declaration of Nancy Rice, AR 291-292, ¶¶ 5&6.

Finally, HHSC's claim that the trial court failed to consider whether Linda "had received prior authorization" once again ignores the fact that Linda's entitlement to Medicaid prior authorization of the recommended wheelchair was the central issue before the trial court. It goes without saying that Linda had not received Medicaid prior authorization before filing this case in the district court. HHSC's claim that the trial court erred by "discarding" these additional "regulatory prerequisites" has no merit.

2. *HHSC Failed to Address Linda Puglisi's Medical Need for a Custom Power Wheelchair with Integrated Standing Feature.*

HHSC failed to apply its own medical necessity standards to determine whether the evidence submitted by Linda's medical providers established that a custom power wheelchair with integrated standing feature will correct or ameliorate her disability or medical condition or will serve a specific medical purpose for her. 2013 TMPPM DME Handbook, §2.2.2; 1 TEX. ADMIN. CODE §354.1039(a)(4)(D). To be clear, HHSC made **no** decision whether the standing feature of the recommended wheelchair is medically necessary for Linda even though standing is the essential wheelchair function she requires to address her numerous medical conditions caused or exacerbated by prolonged sitting day in and day out. The agency failed to address this critical issue, and instead, limited its medical necessity determination to the wheelchair base and seat elevator, two parts of the wheelchair that are required to operate the standing function of the

24

recommended wheelchair. This fundamental error, and others, justified the trial court's reversal of HHSC's decision

The administrative record demonstrates that Linda's well-qualified health care providers submitted ample evidence of her medical need for the recommended wheelchair.[10] This documentation established that Linda suffers from numerous medical conditions secondary to quadriplegia and prolonged sitting (12 hours) in a wheelchair every day. These conditions include osteopenia and an increased risk for bone density loss, compromised soft tissue integrity, impaired integumentary sensation and respiratory function, neurogenic bowel, and neurological pain. Puglisi App. 2, p.50, ¶2. As a result, Linda has a medical need to stand numerous times throughout the day to address the adverse effects of these serious medical conditions. According to Linda's physician:

> This increased frequency of standing will maximize the medical benefits of standing, including but not limited to, providing complete pressure relief from prolonged sitting, maintaining bone density,

---

[10] In the Medicaid program, treating medical professionals play a central role in determining their patient's medical needs. As described in the legislative history of the Medicaid Act:

> The committee's bill provides that the physician is to be the key figure in determining utilization of health services - and provides that it is a physician who is to decide upon admission to a hospital, order tests, drugs and treatments, and determine the length of stay. For this reason the bill would require that payment could be made only if a physician certifies to the medical necessity of the services furnished.

S.Rep. No. 404, 89th Cong., 1St Sess., reprinted in 1965 U.S.C.C.A.N. 1943. *See Weaver v. Reagan*, 886 F. 2d 194, 200 (8th Cir. 1989), ("[t]he Medicaid statute and regulatory scheme create a presumption in favor of the medical judgment of the attending physician in determining the medical necessity of treatment.)

decreasing muscle tone, improving circulation, increasing respiratory function, and maintaining/improving range of motion to hips, knees, and ankles. Reducing or eliminating the occurrence of these medical complications from prolonged sitting will help Linda maintain her health and well-being and decrease the associated costs of her future medical care. Puglisi App. 2, p.51, ¶4.

Linda's physician further made clear that "[w]ith the recommended wheelchair, Linda will be able to stand more often and for shorter periods, making each standing opportunity more effective in preventing bone loss and promoting bone density." Puglisi App. 2, p.51, ¶3. Her occupational therapist also explained that the recommended wheelchair will enhance Linda's "biomechanical alignment throughout the entire body on a daily basis, which helps to prevent further impact of spasticity on joints in upright postures." Puglisi App. 3, p.69, ¶1.

Additionally, Linda's physician described why a separate stander will not meet her medical needs:

> Unlike a separate stander that would require Linda to have caregiver assistance each time she uses the device, the recommended wheelchair will allow Linda to independently stand as often as possible and in any location, whether at home or in the community. Research demonstrates that short, frequent standing is more effective in improving bone density than one long standing episode. With the recommended wheelchair, Linda will be able to stand more often and for shorter periods, making each standing opportunity more effective in preventing bone loss and promoting bone density.

Puglisi App.2, p.51, ¶ 3.

Finally, Linda's evidence established that the recommended wheelchair requires several components, including tilt and recline, center mount articulating

elevating leg rests, a stand and drive leg rest assembly, and seat elevation, for the standing feature to function. As explained, the standing system is not operational without these components, all of which must be accommodated by a Group 4 wheelchair base. Puglisi App.2, p. 51, ¶1; App. 5, p. 293, ¶5. According to Linda's physician,

> [T]he specific wheelchair recommended for Linda - Permobil C500VS - requires a Group 4 base, with seat elevation and integrated standing feature to permit the user to independently stand. As such, these components cannot be "removed" from the prior authorization request without substantially changing the nature of the wheelchair.

At the fair hearing, Molina failed to prove the accuracy of the medical necessity determinations identified in its denial notice.[11] Nor did Molina offer any evidence that its medical necessity decision was made by qualified medical professionals. While Molina's denial notice suggests that a physician made this decision, HHSC App. 1, their evidence established that Linda's wheelchair request was sent to a third-party entity to determine medical need. HHSC App. 2, Finding of Fact 5. This third-party reviewer was not a physician, an occupational therapist or a physical therapist.[12] AR 118.

Molina also was clear it did not apply Texas Medicaid's medical necessity standards to Linda's prior authorization request. As they explained:

---

[11] Pursuant to 1 TEX. ADMIN. CODE § 357.9, Molina had the burden to prove by a preponderance of the evidence that the reasons for denial identified in its notice of adverse action were factually accurate and legally correct.

[12] Texas Medicaid requires that wheelchair evaluations be conducted by a licensed physical or occupational therapist or physician. 2015 TMPPM §2.2.15.10.

Molina utilizes the standards set forth by the National Committee for Quality Assurance (NCQA). Accordingly, the definition of "Medical Necessity" as set by NCQA as follows:

Determinations on decisions that are (or which could be considered to be) covered benefits, including determinations defined by the organization; hospitalization and emergency services listed in the Certificate of Coverage or Summary of Benefits and care or service that could be considered either covered or non-covered depending on the circumstances.[13]

AR 326, Response to Interrogatory No. 6.

Molina's denial contained several erroneous statements. As to the standing feature, Molina claimed it "is not considered medically necessary because driving standing up is not a medical necessity." HHSC App.1. However, Molina offered no credible evidence to support this statement. In fact, this assertion completely misconstrues the purpose and function of the wheelchair standing feature. Linda's medical professionals did not recommend this feature so Linda could drive her wheelchair while standing.[14] They recommended this feature so that Linda can independently stand throughout the day to address the many medical conditions she experiences as a result of prolonged sitting.

As to the seat elevator, Molina claimed "the documentation submitted did not indicate how the power seat elevator system would promote independence."

---

[13] Federal Medicaid law prohibits managed care organizations from applying a more restrictive medical necessity standard than the one established in "State statutes and regulations, the State Plan, and other State policy and procedures." 42 C.F.R. § 438.210(a)(4)(i).

[14] Linda's evidence established that "[t]he standing feature of the Permobil C500 can be used while the wheelchair is stationary or while moving at low speeds." *See* Affidavit of Amy Morgan, PT. Puglisi App. 5, ¶10.

28

HHSC App.1. This statement was based on a TMHP policy governing power seat elevators required to facilitate independent transfers. TMMPM §2.2.15.15. HHSC App. 5. However, this policy has no relevance to Linda's medical need for a standing wheelchair as the seat elevator was not requested for transferring. It was requested because the standing feature of the recommended wheelchair will not operate without it.

Importantly, Molina did not refute the medical evidence submitted by Linda's medical providers or dispute their professional opinions that frequent daily standing is required to address her numerous medical conditions. In fact, Molina conceded Linda's medical need to stand by suggesting she obtain a separate standing device.[15] HHSC App. 2, Finding of Fact 10.

Moreover, Molina did not dispute the evidence establishing that Linda cannot access a separate stander on her own due to the severity of her disability and that she lacks sufficient personal care providers to assist her with using such equipment numerous times throughout the day. Puglisi App. 2, p. 50, ¶3; HHSC App. 2, Finding of Fact 10. Even Molina's third-party reviewer did not conclude that a separate stander was sufficient to meet Linda's needs. Rather, he acknowledged the opinion of Linda's medical providers "that the member is unable

---

[15] According to Texas Medicaid policy, separate standers are approved to address medical needs like those experienced by Linda, *e.g.* "improve digestion, increase muscle strength, decrease contractures, increase bone density, and minimize decalcification (this list is not all inclusive)." TMPPM DME Handbook, §2.2.15.22.1.

to reap [the] benefits [of standing] unless they have the stander on their chair…" AR 118, ¶4.

Like Molina, HHSC failed to apply the agency's medical necessity standards established in Texas Medicaid rule and policy. HHSC did not determine whether the recommended custom power wheelchair with integrated standing feature will correct or ameliorate the medical conditions documented by Linda's medical professionals or will serve a specific medical purpose for her. HHSC did not address Molina's assertion that "driving while standing is not a medical necessity" and ultimately, made **no** decision whether the standing feature is medically necessary for Linda. It is this essential feature, however, that was recommended by Linda's medical providers to address her numerous medical conditions caused or exacerbated by prolonged sitting day in and day out.

HHSC also erroneously determined that a seat elevator is not medically necessary because it "will not facilitate independent transfers to and from the wheelchair for Appellant." HHSC's App. 2. Again, this determination ignores the critical fact that a seat elevator was included in the prior authorization request because the recommended wheelchair will not stand without it. Certainly, Molina made no attempt to disprove Linda's evidence that the seat elevator ensures "the anterior stability of the wheelchair by allowing the caster wheels to be in contact with the ground" when standing. Puglisi App. 5, ¶ 5.

Although HHSC's hearing officer limited his medical necessity determination to the seat elevation device, HHSC's reviewing attorney went one step further. Completely ignoring Linda's medical need for the standing feature, he determined that Linda did not qualify for the Group 4 base on the recommended wheelchair. HHSC App. 3. While acknowledging that "the integrated standing feature and seat elevation system are not available with the Group 3 custom power wheelchair, HHSC App. 3, Finding of Fact 7, he ignored the fact that Molina did not deny prior authorization of the Group 4 base on the basis of medically necessity. Faced with insufficient medical evidence to support Molina's denial, HHSC's reviewing attorney fashioned a new rationale for the denial, in violation of Linda's due process right to timely and adequate notice of all reasons for the denial, with supporting legal citation, *prior* to the fair hearing. 42 C.F.R §§ 431.210(b-c).

The bottom line is that the administrative record contains no credible evidence refuting the professional opinions of Linda's medical providers that a custom wheelchair with integrated standing feature will address the "numerous secondary medical conditions Linda faces due to her spinal cord injury" and that "a separate stander will not provide the same medical benefits for Linda." Puglisi Apps. 2, 3, 6.

In this appeal, HHSC's defense of its hearing decision begins with the erroneous assertion that Linda was required to prove her medical need for a Group 4 wheelchair base. This is incorrect. As explained above, this claim was not part of Molina's medical necessity denial, but rather, was the post hoc invention of HHSC's reviewing attorney. HHSC App 3. HHSC cannot ignore the fact that Molina's evidence wholly failed to refute Linda's medical need to stand and her inability to use a separate stander and then concoct a new basis for denial after the fair hearing. Molina's denial notice does not cite TMPPM 2.2.14.12.5 as support for its decision and HHSC's argument concerning this policy has no bearing on the outcome of this case. Molina recognized that the Group 4 wheelchair base "was requested in order to accommodate the Power Stand and Drive function." HHSC App. 1. And as Molina's outside reviewer noted, the requested wheelchair only comes with a Group 4 base and the difference between a Group 3 and 4 base is not a question of medical necessity. AR 118.

HHSC's assertion that Linda was required to demonstrate that a Group 4 wheelchair base is medically necessary, *i.e.* will correct or ameliorate her disability, condition, or illness, is nonsensical. The recommended wheelchair requires many components to be operational and there is no requirement that medical necessity be demonstrated for each and every one. The undisputed evidence established that several identified components, as well as the Group 4

32

wheelchair base, are required to operate the standing feature of the wheelchair. Puglisi App. 5.

HHSC's defense of its medical necessity decision concerning the seat elevation system fails for the same reason. It is undisputed that the power seat elevator, like the Group 4 wheelchair base, is required to operate the standing feature of the recommended wheelchair. HHSC cannot deny Linda's medical need for a custom power wheelchair with integrated standing feature because she lacks the functional ability to perform "uphill transfers." The agency's reliance upon TMPPM 2.2.14.15 to deny the recommended wheelchair wholly ignores the fact that Linda has a medical need to stand throughout the day and the recommended wheelchair is the only item of DME that will meet her medical needs.[16]

Moreover, HHSC's argument concerning medical necessity for a seat elevator creates an impermissible distinction between Medicaid beneficiaries based on the severity of their disabilities. As such, individuals who have a medical need to stand and who can perform independent transfers, "particularly uphill transfers," can obtain a standing wheelchair, while those with more severe disabilities who have the same medical need to stand but lack the functional ability to self-transfer, cannot. Under HHSC's analysis, individuals with quadriplegia would never qualify

---

[16] HHSC suggests Linda's documentation "did not demonstrate how the power seat elevator system would promote independence." This is inaccurate. Linda's physician specifically advised that "the specific wheelchair recommended for Linda - Permobil C500VS - requires a Group 4 base, with seat elevation and integrated standing feature to permit the user to *independently* stand." (emphasis added) Puglisi App. 2, ¶1.

for a wheelchair with integrated standing feature due to the severity of their disabilities and their functional inability to self-transfer. While this distinction between Medicaid beneficiaries makes no medical sense, it also violates the Medicaid Act's comparability requirement and its prohibition against diagnosis-based decision making.[17] HHSC cannot deny eligibility for standing wheelchairs based upon severity of disability when there is no medical rationale to support this distinction.

HHSC's medical necessity arguments concerning the Group 4 power base and seat elevator are a futile attempt to evade the fact that its hearing decision failed to address Linda's medical need for a custom power wheelchair with integrated standing feature. The trial court correctly determined that HHSC's hearing decision is unsupported by substantial evidence.

3. *HHSC Failed to Employ the Correct Test for Determining Medicaid Coverage of DME.*

Medical equipment is covered through Medicaid's home health benefit when the item fits within the state's DME definition. Puglisi App. 1. HHSC concedes this is the proper test for DME coverage, HHSC Brief, p.30, but ignores the fact that both its hearing officer and reviewing attorney failed to apply this test to the recommended wheelchair standing feature. Instead, they erroneously presumed

---

[17] 42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. § 440.240(b); *See Lankford v. Sherman,* 451 F.3d 496 (8th Cir. 2006) (comparability requirement violated when state covers items of DME for certain individuals with disabilities but not for others.)

34

non-coverage based upon TMHP's policy exclusion of standing features and sustained Molina's coverage determination on this basis. HHSC App. 2, 3.

Contrary to HHSC's claim, Linda has never suggested that Medicaid coverage of the recommended standing feature should be "assumed." Instead, she maintains that HHSC cannot lawfully apply TMHP's presumption of non-coverage as it did in this case.[18] Here, there is no question the standing feature meets the state's DME definitions and its definition of wheeled mobility systems.

HHSC relies upon *Detgen v. Janek,* 752 F. 3d 627 (5th Circuit 2014), to defend its failure to correctly determine Medicaid coverage of the recommended wheelchair component, however, this reliance is misplaced. *Detgen* upheld the state's exclusion of ceiling lifts, finding that a state can choose "by definition" to exclude ceiling lifts from coverage. *Id.* at 632. Here, the opposite is true and necessarily compels a different outcome. The Texas Legislature chose to define custom wheelchairs to *include* wheelchairs with *complex or specialized* components like the standing feature at issue in this case. TEX. HUM. RES. CODE § 32.0425.

Next, *Detgen* found the exclusion of ceiling lifts to be "reasonable" because of the availability of "more cost effective alternatives." According to the Court, "a

---

[18] HHSC acknowledges that CMS reminded the agency of this specific test for DME coverage, yet inexplicably claims that TMHP's exclusion of wheelchair standing features complies with federal policy. HHSC Brief, p. 30. HHSC makes no attempt to explain the contradiction between these two statements.

categorical exclusion based upon the availability of cost effective alternatives cannot mean that the state has denied a medically necessary device." *Id*. at 632. Here, however, HHSC's exclusion of wheelchair standing features means the state has denied Linda a medically necessary device for which there is no alternative that will meet her medical needs. It is undisputed that Linda cannot transfer to a separate stander numerous times each day to correct or ameliorate her many medical conditions caused by prolonged sitting.

Finally, *Detgen* is not dispositive in Linda's case because this decision is wrong. It is an outlier among dozens of case rejecting states' efforts to exclude a wide array of DME items and uniformly holding such DME exclusions to be unlawful.[19] As explained in *Lankford v. Sherman*, 451 F.3d 496, 511 (8th Cir.

---

[19] *See e.g., Alvarez v. Betlach*, 572 F. App'x 519 (9th Cir.) *cert. denied*, 135 S. Ct. 870 (2014)(rejecting Arizona Medicaid's exclusion of incontinence briefs); *Lankford v. Sherman*, 451 F.3d 496 (8th Cir. 2006) (rejecting Missouri Medicaid's restrictions on DME coverage); *Fred C. v. Texas Health & Human Services Comm'n*, 988 F.Supp. 1032 (W.D.Tx. 1997), *affirmed per curiam* 167 F.3d 537 (5th Cir. 1998) (requiring coverage of augmentative communication devices as DME and prosthetic devices); *Meyers v. Reagen,* 776 F.2d 241 (8th Cir. 1985)(requiring coverage of augmentative communication devices that fit within the scope of the equipment included in Medicaid's speech-language pathology service); *Davis v. Shah,* No. 12-CV-6134 CJS, 2012 WL 1574944, (W.D.N.Y. May 3, 2012) (rejecting exclusion of orthopedic footwear and compression stocking as DME for certain beneficiaries) *Hiltibran v. Levy* 793 F.Supp.2d 1108 (W.D. Mo. 2011)(granting preliminary injunction requiring coverage of incontinence aids for adults as medical equipment); *Jasset v. R.I. Dept. of Hum. Serv.*, 2006 WL 2169891 at * 5 (R.I. Super. July 31, 2006) (*citing Bristol v. R.I. Dept. of Hum. Serv.*, 1997 WL 839884, at *5 (R.I. Super. Jan. 30, 1997)(prohibiting intent to go to work or school as a coverage criterion for a wheelchair because neither is related to medical necessity))*; Blue v. Bonta*, 99 Cal.App. 4th 980, 121 Cal.Rptr.2d 483 (Cal App. 2002) (requiring coverage of stairway elevator based on Medi-Cal DME definition); *T.L. v. Colorado Dept. of Health Care Policy & Fin.*, 42 P.2d 63 (Colo. App. 2002) (prohibiting express exclusion of whirlpool bath from consideration as DME and without consideration of medical need); *Will T. v. Taylor,* 465 F.Supp.2d 1267 (N.D. Ga. 2000)(requiring coverage of speech generating devices as DME,

2006), "[a] state's failure to provide Medicaid coverage for non-experimental, medically necessary services within a covered Medicaid category is both per se unreasonable and inconsistent with the stated goals of Medicaid."

Ignoring these many cases, the *Detgen* court reached a conclusion that does not square with federal Medicaid case law or policy. This is particularly true concerning its interpretation of the *DeSario Letter*. HHSC App. 6. Contrary to the plain language of this federal guidance, the Court concluded that states are authorized to maintain a "never approved" list of DME. *Id.* at 632-633. If this were correct, the Second Circuit's decision in *DeSario v. Thomas* upholding the state's list of DME exclusions would still be good law. 139 F.3d 80 (2d Cir. 1998). But it is not good law precisely because CMS clarified that exclusions of medical equipment meeting the state's definition of DME violate the Medicaid Act's

---

prosthetic devices and equipment under the speech-language pathology benefit); *Bell v. Agency for Health Care Admin.*, 768 So.2d 1203 (FL. App. 2000)(requiring coverage and provision of insulin pumps when medically necessary); *Johnson v. Minn. Dept. of Human Serv.*, 565 N.W.2d 453, 456 (Minn. App. 1997) (requiring coverage of a stand-up wheelchair to meet recipient's specific medical needs); *Davis v. Shrader*, 687 N.E.2d 370 (Ind. App. 1997) (requiring coverage of orthopedic shoes; precluding use of irrebuttable presumptions against coverage of specific types of treatment within covered services); *Ohlson v. Weil,* 953 P.2d 939 (Colo. App. 1997)(requiring coverage of body brace that meets Medicaid's DME definition); *Brisson v. Dep't of Social Welf.,* 702 A.2d 405 (VT. 1997)(prohibiting exclusion of closed circuit television because it meets Medicaid's definition of eyeglasses); *Hunter v. Chiles,* 944 F.Supp. 914 (S.D. Fl. 1996)(requiring coverage of speech generating devices as DME); *Myers v. State of Mississippi* 3:95 CV 185 LN (Slip Op. S.D. Miss. 1995)(requiring coverage of speech generating devices as DME); *Bowers v. Thompson*; No. 89-2-00553-8 Stipulation & Agreement & Consent Order (Wash. Super. Ct. Thurston County Oct. 15, 1990) (class action consent decree establishing medical necessity as decision-making standard for durable medical equipment, prosthetic devices and non-durable medical supplies); *Ledet v. Fischer,* 638 F. Supp. 1288, 1291 (M.D. La. 1986) (requiring coverage of eyeglasses regardless of diagnosis); *Baker v. Commonwealth of Pa. Dept. of Pub. Welfare*, 502 A.2d 318 (Pa. Commw. 1985) (requiring coverage of wheelchair with 500-pound carrying capacity).

reasonable standards requirement and implementing amount, duration and scope rule. 42 U.S.C. § 1396a(a)(17); 42 C.F.R. § 440.230(b-c). Relying upon this federal guidance, the Supreme Court vacated the Second Circuit's decision upholding Connecticut Medicaid's list of DME exclusions. *Slekis v. Thomas*, 525 U.S. 1098 (1999).[20]

Moreover, HHSC cannot claim to be in compliance with the *DeSario* Letter's requirement that states establish "reasonable and meaningful" procedures for making individualized determinations of DME coverage, while arguing that Linda's access to this process was not warranted. HHSC Brief, p. 26. According to 1 TEX. ADMIN. CODE § 354.1039(a)(4)(D), medical equipment may be covered when it is medically substantiated that the requested item would "*serve a specific medical purpose on an individual case basis*." (Emphasis added.) Molina failed to apply this standard to Linda's wheelchair request.[21] HHSC failed to do so, as well. HHSC cannot evade this fact by claiming that "Puglisi did not request exceptional circumstances review of her request for an integrated standing feature." HHSC Brief. p. 25-26. It was incumbent upon Molina and HHSC to apply the correct medical necessity standards to Linda's prior authorization request.

---

[20] The Supreme Court Order stated: [P]etition for certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Second Circuit *for further consideration in light of the interpretive guidance issued by the Health Care Financing Administration on September 4, 1998.* (emphasis added).

[21] When asked in discovery whether an exceptional circumstances review of Linda's prior authorization request had been conducted, Molina objected to the question and provided no response. AR 327, Response to Interrogatories No. 10 and 11.

HHSC's assertion that Linda relies upon a "vacated opinion and judgment" to support her position that a wheelchair standing feature is covered by Medicaid is incorrect.[22]    HHSC Brief, p.28.    As explained above, Linda relies on federal Medicaid policy and dozens of federal and state court decisions spanning more than 30 years, all of which make clear that states must cover items of medical equipment that meet their DME definitions.  *See* n.19 *supra.*  And as explained above, CMS recently reminded HHSC of this Medicaid test for DME coverage. Puglisi App. 1. There is no excuse for HHSC's failure to apply this DME coverage test in Linda's case.

HHSC devotes a considerable amount of its brief defending its erroneous coverage determination by attempting to refute an argument Linda has never made. To be clear, Linda did **not** file a rule challenge pursuant to TEX. GOV'T CODE § 2001.038.  CR 3-31.  Nor did she ask the trial court to invalidate Medicaid rules, 1 TEX. ADMIN. CODE §§ 1031, .1035, .1039, and .1040, or "to modify the Medicaid Home Health Services program."  HHSC Brief, p. 30-31.  As explained in Section D. above, Linda has no complaint with these rules as each supports her entitlement

---

[22] HHSC acknowledges that the three "errors" identified by the Fifth Circuit in *Koenning v. Suehs,* 897 F. Supp.2d 528 (S.D. 2012), vacated and dismissed as moot, *sub nom. Koenning v. Janek,* 539 Fed. Appx. 353 (5th Cir. 2013) did not relate to the merits of the decision.  HHSC Brief, p. 28. Moreover, the Fifth Circuit found the case was moot because, on remand, Medicaid had approved standing wheelchairs for two of the plaintiffs and afforded a fair hearing to the third plaintiff on the issue of medical necessity.  As described by the district court, two of the plaintiffs had significant spinal cord injuries and severe functional limitations.  897 F. Supp. 2d at 545-536.  These functional limitations are much like those experienced by Linda Puglisi, yet Texas Medicaid eventually authorized standing wheelchairs for all of the *Koenning* plaintiffs.

to Medicaid prior authorization of a custom power wheelchair with integrated standing feature. Rather, Linda asked the trial court to reverse HHSC's hearing decision because the agency failed to properly apply these rules, and the criteria established therein, to her prior authorization request. HHSC's protracted arguments concerning rule challenges under TEX. GOV'T CODE § 2001.038, including the redundant remedies doctrine and the constitutional separation of powers requirement, have no bearing on this case and require no response. HHSC's Brief, pp. 30-41.

While Linda does not challenge the legality of HHSC's DME rules, she does maintain that TMHP's policy excluding wheelchair standing features from Medicaid coverage conflicts with these rules, and as such, is an invalid basis for HHSC's decision on this issue. Failing to apply the correct test for Medicaid coverage of the recommended standing feature, HHSC regarded TMHP's policy exclusion of wheelchair standing features as binding on its decision and concluded that "mobile standers, power standing systems on a wheeled mobility device are not a benefit of Home Health Services." HHSC App. 2, Conclusion of Law; App. 3, Conclusion of Law 3. The agency ignored the fact that the recommended standing feature is a specialized wheelchair component and specialized components for custom wheelchairs are authorized for Medicaid coverage by

statute and rule. TEX. HUM. RES. CODE § 32.0425; 1 TEX. ADMIN. CODE § 354.1040.

TMHP's exclusion of wheelchair standing features meets all of the criteria of a "rule" identified in the Texas Administrative Procedures Act (APA), but was not promulgated in compliance with the Act. Pursuant to TEX. GOV'T CODE § 2001.003(6), a "rule" is defined as:

(A) a state agency statement of general applicability that:
  (i) implements, interprets, or prescribes law or policy; or
  (ii) describes the procedure or practice requirements of a state agency;
(B) includes the amendment or repeal of a prior rule; and
(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

TMHP's policy clearly meets these criteria. First, this exclusion is a "statement of general applicability" interpreting law or policy and affecting all Medicaid beneficiaries in need of this custom wheelchair. *See Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.*, 997 S.W.2d 651, 658 (Tex. App.—Austin 1999, pet. dism'd w.o.j.) (finding statements in agency memoranda were rules because they imposed binding instructions affecting private rights of all similarly situated persons.) As HHSC's decision demonstrates, this policy exclusion dictates a specific result - a finding of non-coverage of the standing feature - without regard to the required test for Medicaid DME coverage.

41

Both HHSC's hearing officer and reviewing attorney regarded this policy as binding on their decision concerning Medicaid coverage in this case.[23]

Next, TMHP's policy limits the scope of custom wheelchair coverage and essentially amends Texas law defining both DME and custom wheelchairs. The plain language of TEX. HUM. RES. CODE § 32.0425 and 1 TEX. ADMIN. CODE § 354.1040 makes clear that Medicaid coverage of custom power wheelchairs includes wheelchairs with "complex or specialized components" like the one recommended by Linda's treating medical providers.

Finally, this policy is not a "statement regarding only the internal management or organization" of HHSC, but rather, is a bright-line rule the agency claims is dispositive on the question of Medicaid coverage of wheelchair standing features. *See Combs v. Entertainment Publications, Inc.*, 292 S.W. 3d 712, 722 (Tex. App.—Austin 2009, no pet.) (holding Comptroller's policy statement invalid because it was not properly promulgated pursuant to the APA.)

Neither HHSC nor its contractors can limit the scope of the custom wheelchair benefit by establishing a policy that conflicts with the express language of state law and agency rules. Yet, TMHP's exclusion of wheelchair standing components does just that. This policy fits squarely within the Texas APA's

---

[23] Pursuant to 1 TEX. ADMIN. CODE § 357.703(b)(3), HHSC's attorney was required to "review[ ] the hearing decision for errors of law and fact . . . ." Like the hearing officer, however, he failed to apply the test for DME coverage established in federal policy and to determine the legality of TMHP's policy exclusion of wheelchair power standing features.

definition of a rule, but was not promulgated pursuant to law.[24] As such, it is an invalid basis for the agency's decision that the requested wheelchair standing feature is not a covered benefit. *See El Paso Hosp. Dist. v. Texas Health and Human Servs. Comm'n*, 247 S.W. 3d 709, 714 (Tex. 2008) (holding HHSC's policy establishing a cut-off date for Medicaid hospital claims that did not appear in the agency's base-year rule was not properly promulgated under the APA.)

This Court's recent decision in *Texas State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 535 (Tex. App. 2014), supports this conclusion. There, the plaintiff sought review of the Texas Board of Pharmacy's final administrative decision suspending her license. Witcher argued that the Board's reliance on a policy mandating this penalty was arbitrary and capricious and the result of improper ad-hoc rulemaking. Agreeing with Witcher, this Court upheld the district court's decision finding that the Board's "policy" was, in fact, an improperly promulgated "rule" under the APA, and an invalid basis for the imposed penalty.

The same is true here. There is no statute or regulation that supports HHSC's decision concerning Medicaid coverage of the requested standing feature. To the contrary, the requested wheelchair component fits within the applicable

---

[24] The APA requires state agencies to provide notice and the opportunity for public comment so that affected persons can be heard on proposed rules. *See* TEX. GOV'T CODE §§ 2001.023–.030. "The Legislature delegates formal rulemaking power to an agency in the expectation that an agency will ordinarily adopt rules of general application through that power." *Rodriguez v. Serv. Lloyds Ins. Co.,* 997 S.W.2d 248, 255 (Tex. 1999).

definitions found in state law and regulation. Yet, HHSC treated TMHP's policy exclusion as binding on its decision concerning Medicaid coverage. "Arbitrary and capricious agency action [ ] may be found when an agency improperly bases its decision on non-statutory criteria." *Public Utility Commission v. South Plains Electric Cooperative, Inc.,* 635 S.W.2d 954, 957 (Tex.App.—Austin 1982, writ ref'd n.r.e.).

In sum, HHSC failed to apply the longstanding test for Medicaid coverage of DME, and instead, relied upon an unlawful exclusion that violates the requirements of both the Texas APA and the reasonable standards requirement of the Medicaid Act. 42 U.S.C. § 1396a(a)(17). HHSC ignored the scope of the custom wheelchair benefit established by the Texas legislature and violated the Medicaid Act's amount duration and scope rule. 42 C.F.R. § 440.230(b-c). The recommended wheelchair, with all of its custom components, meets HHSC's DME definitions and fits within the custom wheelchair benefit established in state law. HHSC's conclusion that the recommended standing feature is not covered through the Medicaid home health benefit is wrong. CR 348-349. Having found that HHSC's decision failed "to comply with controlling applicable federal and state law," the trial court correctly reversed the agency's decision on the issue of Medicaid coverage.

**F. HHSC Violated Linda Puglisi's Procedural Due Process Rights.**

It is well established that individuals who apply for or receive public assistance such as Medicaid are entitled to certain due process protections, including legally sufficient notice and the opportunity for a fair hearing, when they are denied this assistance by the state. *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct.1011, 25 L.Ed.2d 287 (1970); U.S. CONST. amend. XIV; 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.200 *et seq.* While the trial court did not address the due process violations asserted in this case, the hearing record demonstrates that HHSC failed to enforce Linda's due process right to legally sufficient notice and further exacerbated this violation by sustaining the denial of Linda's prior authorization on grounds not identified in Molina's notice of adverse action.

*1. Medicaid Beneficiaries Have a Protected Property Interest in Their Medicaid Benefits.*

HHSC's assertion that Linda has no protected property interest in her Medicaid benefits is incorrect. As explained in *Jonathan C. v. Hawkins,* No. CIV A 9:05-CV-43, 2006 WL 3498494,*12 (E.D. Tex. Dec. 5, 2006):

> Courts view welfare entitlement more like "property", rather than a "gratuity", and such benefits are a matter of statutory entitlement for persons qualified to receive them. Therefore, under the law, beneficiaries do, in fact, have a constitutionally protected property interest in Medicaid benefits. *(Citations omitted)*

*See also Hamby v. Neel,* 368 F.3d. 549, 559 (6th Cir. 2004); *Thompson v. Roob,* 2006 WL 2990426, at *5-6 (S.D. Ind. Oct. 19, 2006); *Ladd v. Thomas,* 962 F.

45

Supp 284, 289 (D. Conn. 1997); *Ability Center of Toledo v. Lumpkin*, 808 F.Supp.2d.1003 (N.D. Ohio 2011); *Fishman v. Daines*, 743 F.Supp.2d. 127,146 (E.D. N.Y 2010).

HHSC's next assertion that Linda "has never acquired the benefits of this Medicaid program" is also incorrect. Unlike the Medicaid applicants in *Johnson v. Guhl*, 91 F.Supp. 2d 754 (D. N.J. 2000), Linda has received Medicaid benefits since shortly after her injury in 2011. Moreover, Medicaid beneficiaries denied DME requested through the state's prior authorization procedures are entitled to due process. *See Ladd v. Thomas,* 962 F. Supp. 284 (D. Conn. 1997) (holding *Hamby v. Neel*, 368 F.3d 549, 559 (6th Cir. 2004), (holding plaintiffs had a property interest in the [Medicaid] coverage for which they hope to qualify.) HHSC's own rule also establishes this right. 1 TEX. ADMIN. CODE § 357.3(b)(1)(E).

HHSC's reliance on case law involving the denial of professional licenses, *Neuwrith v. Louisiana State Bd. of Dentistry,* 845 F. 2d 553 (5th Cir. 1988), termination from employment, *Woody v. Dallas,* 809 F. Supp. 466 (N.D. Tex. 1992), or the distribution of insurance payments, *Liberty Mut. Ins. Co. v. Texas Dep't of Ins.*, 187 S.W. 3d 808 (Tex. App. Austin 2006, pet denied) is misplaced and has no bearing on Linda's due process rights as a Medicaid beneficiary.

*2.*     *Molina's Denial Notice does not Comport with Due Process and HHSC Failed to Address this Issue.*

HHSC and its contracted entities are required to afford due process to Medicaid beneficiaries when their "claim for medical assistance under the plan is denied or not acted upon with reasonable promptness." 42. U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.200 *et seq*.; 42 C.F.R. § 438.404; 1 TEX. ADMIN. CODE § 357.3(b)(1)(E).   Included within these due process rights is the right to legally sufficient notice that contains, among other things, "the reasons for the intended action" and the "specific regulations that support…the action."   42 C.F.R §§ 431.210(b) and (c). The reason for this required content is clear.  As explained by the court in *Gray Panthers v. Schweiker,* 652 F. 2d 146, 158 (D.C. Cir. 1980):

> It is universally agreed that adequate notice lies at the heart of due process.  Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose and resembles more of a scene from Kafka than a constitutional process.  Without notice of the specific reasons for denial, a claimant is reduced to guessing what evidence can or should be submitted in response and is driven to responding to every possible argument against denial at the risk of missing the critical one altogether.

Here, Molina's denial notice failed to provide the required specificity concerning the reasons it determined the recommended wheelchair was not covered by Medicaid or was not medically necessary for Linda. This notice also failed to include citations to the statutes and rules that support the cursory explanation it did provide.  In *Thompson v. Roob*, 2006 WL 2990426 (S.D. Ind.

47

Oct. 19, 2006), the court held that the notices issued by the Indiana Medicaid program "violated Plaintiffs' due process rights as a matter of law" because "[i]n the public benefit context, procedural due process requires "ascertainable eligibility standards" to be articulated and implemented, in order to guarantee objectivity and provide adequate notice." *Id.* at *7. Molina's notice included no ascertainable standards upon which its perfunctory denial was based and Linda's repeated request for these standards went ignored. As such, Molina's notice of adverse action violated Linda's due process right to legally sufficient notice.

HHSC seeks to excuse Molina's due process violation by pointing out that the notice stated that Linda had the right to "obtain a copy of the guidelines used by MHT to decide the outcome." HHSC Brief, p. 46. Notably, the agency overlooks the fact that Molina failed to provide the requested policies despite repeated requests by Linda's counsel. AR 267, 268, 276. Like Molina, HHSC also failed to respond to Linda's repeated requests to the hearing officer concerning Molina's legally insufficient notice. AR 283, 284, 285. HHSC has established specific procedures for its hearing officers to follow when a Medicaid beneficiary questions the legal sufficiency of a Medicaid denial notice, but HHSC ignored these procedures in this case. Puglisi App. 8.

3.  *HHSC's Administrative Review Does Not Comport with State Law and Further Compounded the Due Process Violations in this Case.*

48

The final decision issued by HHSC's reviewing attorney further compounded the due process violations in this case. HHSC does not dispute this point, but merely recites several provisions of state law and agency rules governing the administrative review process. These provisions are irrelevant here as there is no dispute that Linda filed a timely request for administrative review or that HHSC's reviewing attorney issued a written decision representing the final decision of the agency. What is relevant is the action by HHSC's attorney to go beyond the reasons for denial identified in Molina's notice of adverse action to shore up support for the hearing officer's decision in this case. HHSC App. 3, Finding of Fact 11. Due process requires timely and adequate notice of all reasons for the denial, with supporting legal citation, *prior* to the fair hearing. 42 C.F.R § 431.210(b-c). HHSC's final decision violated this important protection for Linda Puglisi.

## PRAYER

Appellee, Linda Puglisi, respectfully requests this Court to affirm the trial court's decision in her favor. Appellee further requests all other relief to which she may be entitled.

Respectfully Submitted,

_/s/ Maureen O'Connell_
MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
(512) 458-4800 (Phone)
(512) 458-5850 (Fax)
moconnell458@gmail.com

*Attorney for Appellee*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Tex. R. App. P. 9.4(i)(2)(B) because it contains 12,058 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4(i)(1).

2.      This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

_/s/ Maureen O'Connell_
MAUREEN O'CONNELL

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of July, 2015, a true and correct copy of the foregoing document was electronically filed, and that a true and correct copy of the foregoing document was served by electronic mail on the same date to:

Eugene Clayborn
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711


  /s/ Maureen O'Connell
MAUREEN O'CONNELL

**No. 03-15-00226-CV**

_____

IN THE
THIRD COURT OF APPEALS
AUSTIN, TEXAS

_____

TEXAS HEALTH AND HUMAN SERVICES COMMISSION,
*Appellant,*


v.


LINDA PUGLISI,

*Appellee.*

_____

On Appeal From
The 53rd Judicial District Court of Travis County, Texas
Trial Court Case No. D-1-GN-14-000381
The Honorable Judge Gisela D. Trianna

_____

**APPELLEE'S APPENDIX**
_____


MAUREEN O'CONNELL
Texas Bar No. 00795949
SOUTHERN DISABILITY LAW CENTER
1307 Payne Avenue
Austin, Texas 78757
T: 512.458.5800
F: 512.458.5850
moconnell458@gmail.com

*Attorney for Appellee*

# APPENDIX INDEX

CMS Letter to Texas Medicaid, May 21, 2013 ................................................. Tab 1

Letter of Medical Necessity, Dr. Lisa Wenzel.................................................... Tab 2

TIRR Wheelchair Evaluation.............................................................................. Tab 3

RESNA Position on the Application of Wheelchair Standing
Devices, *Assistive Technology*, 21:161-168, 2009 ........................................... Tab 4

Affidavit of Amy Morgan, PT, ATP.................................................................... Tab 5

Letter of Medical Necessity, Dr. Lisa Wenzel.................................................... Tab 6

*In the Matter of Mary A.*, New York Dept. of Social Services.......................... Tab 7

HHSC Fair and Fraud Hearings Handbook (Excerpt)........................................ Tab 8

# TAB 1



Center for Medicaid and CHIP Services
Disabled and Elderly Health Programs Group (DEHPG)

May 21, 2013

Kay Ghahremani
State Medicaid Director
Texas Health and Human Services Commission
Brown-Heatly Building
4900 N. Lamar Blvd.
Austin, TX 78751-2316

Dear Ms. Ghahremani:

The Centers for Medicare & Medicaid Services (CMS) is writing to clarify our policy on the medical supplies, equipment and appliances (often referred to as Durable Medical Equipment, or DME) that will receive Federal reimbursement.

DME is a component of the home health benefit, which is a mandatory service within the Medicaid program. As such, items of DME meeting the state's definition of such coverage is to be provided to individuals (of any age) meeting the State's medical necessity criteria. In addition, CMS issued a letter to State Medicaid Directors on September 4, 1998 (see attached) interpreting state responsibilities in providing medical equipment in response to the DeSario court decision. This guidance requires states to have a reasonable process for beneficiaries to request items of DME not on a pre-approved list, and the ability for a beneficiary to request a fair hearing to appeal negative determinations.

We understand that the State of Texas is not approving requests for ceiling lifts provided to adult Medicaid beneficiaries, due to prior CMS guidance indicating that Federal reimbursement is not available. We are clarifying here, in a way that supersedes prior CMS guidance on this topic, that coverage of ceiling lifts under the medical equipment benefit is an issue that states must determine consistent with the process described in the September 4, 1998 guidance, and that federal reimbursement is available to the state to the extent that the item is determined to be covered. This means that medically necessary ceiling lifts will be reimbursed by CMS as part of the Texas home health benefit if these lifts meet the state's definition of DME.

In addition, we would like to make sure you're aware of a Notice of Proposed Rulemaking issued July 12, 2011. That regulation proposed changes to the home health benefit to not only codify face-to-face encounters required at section 6407 of the Affordable Care Act, but to also propose definitions of a medical supply, equipment and appliance. Also included was a proposal that any item meeting any of those definitions must be covered under the state plan, and may not be reserved for coverage under a 1915 (c) home and community based services waiver. We are working now to issue a final regulation. We encourage you to familiarize yourself with the provisions of that proposed rule.

127                                                                    P-18

000303

We hope this alleviates any confusion.  Don't hesitate to contact me with any questions.

Sincerely,

/s/

Melissa Harris
Director
Division of Benefits and Coverage

Cc:  Billy Bob Farrell, Dallas Regional Office

000304

# TAB 2

Patient:          Linda Puglisi
Date of Birth:    ▮▮▮▮▮▮
Diagnosis:        Neurofibromatosis Type II; Quadriplegia C1-C4 Incomplete
Subject:          Response to Molina Healthcare's pending notice for custom wheelchair with
                  power standing and seat elevation features.

To whom it may concern:

Linda Puglisi is twenty-six years old and has an urgent need for the custom power wheelchair that was recently recommended for her. While Molina Healthcare is requesting that we exclude the "seat elevator" and "standing feature and all accompanying components" for Ms. Puglisi, we do not agree with these changes. As explained below, it is our professional opinion that the recommended wheelchair with integrated standing feature is medically necessary for this patient as it will allow her to independently stand multiple times each day while at home or in the community. This access to frequent standing is necessary to correct or ameliorate the numerous medical conditions that Linda faces due to prolonged sitting (12 hours) in a wheelchair every day. Please consider the following information concerning this patient's medical condition and current medical needs:

Diagnosis and Functional Status

In November 2011, Linda sustained a C1-4 spinal cord injury (incomplete) following a surgical procedure to remove a tumor near her spine. As a result, Linda has quadriplegia, with very limited movement on her right side. Linda does retain some movement on her left side, but with limited range of motion. Linda also has increased tone on her right side, which fluctuates and causes spasms. While Linda retains good head control, her trunk control and control of upper and lower extremities is poor. She has been diagnosed with osteopenia and is at risk for continued loss of bone density. Linda is also at increased risk for pressure sores due to compromised soft tissue integrity. Linda also experiences impaired respiratory function, neurogenic bowel, neurological pain, and impaired integumentary sensation. Recently, Linda was also diagnosed with Neurofibromatosis Type II (NF2).

Due to the nature and severity of Linda's spinal cord injury, she is dependent on a power wheelchair for independent mobility. In addition, Linda requires caregiver assistance to transfer in and out of her bed and wheelchair. She also utilizes a Left Mobile Arm Support to increase her functional abilities and to participate in activities of daily living. With adequate support, including access to independent standing, Linda can perform some activities of daily living as well as manage her pain.

Wheelchair Assessment and Prior Authorization Request

A comprehensive wheelchair assessment was conducted in February 2013 while Linda was receiving inpatient rehabilitation services at the Texas Institute for Research and Rehabilitation (TIRR). We recommended a power wheelchair with custom features, including a seat elevator, integrated stander, and several other custom components. In this evaluation, we provided information concerning Linda's medical need for each of the recommended custom components. A request for prior authorization of the custom power wheelchair recommended by Linda's OT,

1

31

000050

ATP, and PMR physician was submitted to Molina Healthcare on ██████2013. On April 12, 2013, Molina Healthcare requested that we make numerous changes to Linda's prior authorization request, the most notable of which was the removal of the custom integrated standing feature and seat elevation component. It should be noted that the specific wheelchair recommended for Linda – the Permobil C500 VS – requires a Group 4 base, with seat elevation and integrated standing features to permit the user to independently stand. As such, these components cannot be "removed" from the prior authorization request without substantially changing the nature of the wheelchair recommended for Linda. Because it is our professional opinion that these components are medically necessary for Linda, we write to provide further justification for the requested wheelchair:

## Medical Justification for Recommended Custom Power Wheelchair

As previously noted, standing is critical for Linda to prevent further loss of bone density and risk of bone fractures; decrease muscle tone and spasticity; maintain spinal alignment and delay/avoid skeletal deformities; extend her upper trunk to reduce pressure on internal organs; maintain range of motion; increase flexibility and prevent contractures of the hip, knee, and ankle joints; prevent pressure sores; improve urinary tract drainage and renal function; address gastrointestinal, respiratory, and bowel function; and maintain cardiovascular health. Julianna Arva, et al., *RESNA Position on the Application of Wheelchair Standing Devices*, 21 Assistive Technology, 161-168 (2009)

According to RESNA, the recommended frequency of standing for achieving these medical benefits is "as often as the user can tolerate comfortably; ... ." Unlike a separate stander that would require Linda to have caregiver assistance each time she uses the device, the recommended wheelchair will allow Linda to independently stand as often as possible and in any location, whether at home or in the community. Research demonstrates that short, frequent standing is more effective in improving bone density than one long standing episode. With the recommended wheelchair, Linda will be able to stand more often and for shorter periods, making each standing opportunity more effective in preventing bone loss and promoting bone density. Additionally, the recommended wheelchair will provide Linda with repeated opportunities for "dynamic loading" of the bones in her lower extremities. For example, dynamic loading occurs during the transition from sitting to standing. If an individual stands in a separate stander for one hour, dynamic loading occurs only once. If an individual goes from sitting to standing numerous times every day, more dynamic loading occurs, with great benefit to the user's overall bone health.

It is important to emphasize that Linda participated in a trial of the Permobil power stander with success in standing and driving the chair. With the recommended wheelchair, Linda will be able to independently stand multiple times each day, without risk of transfer injury; and regardless of her location at home or in the community. This increased frequency of standing will maximize the medical benefits of standing, including but not limited to, providing complete pressure relief from prolonged sitting; maintaining bone density, decreasing muscle tone, improving circulation, increasing respiratory function; and maintaining/improving range of motion to hips, knees and ankles. Reducing or eliminating the occurrence of these medical complications from prolonged

2

000051

@006/068

sitting will help Linda maintain her health and well-being and decrease the associated costs of her future medical care.

Again, it is our professional opinion that the recommended wheelchair is medically necessary for Linda and will ameliorate the numerous medical complications she faces due to the severity of her disability. It is also our opinion that there is no other item of equipment or combination of equipment that can address her complex medical needs. We ask that you carefully review the information provided on Linda's behalf and approve the recommended wheelchair for her.

Sincerely,

Lisa Wenzel, M.D.

3

000052

# TAB 3

MSH

## Wheelchair/Scooter/Stroller Seating Assessment Form (CCP/Home Health Services) (7 pages) 1

### Instructions

A current wheelchair/scooter/stroller seating assessment conducted by a physician or a physical or occupational therapist must be completed for purchase of or major modifications (including new seating systems) to a wheeled mobility system. A Qualified Rehabilitation Professional (QRP) must be present and participate in the seating assessment for all wheeled mobility systems and major modifications.

Please attach manufacturer information, descriptions, and an itemized list of retail prices of all additions that are not included in base model price.

Complete Sections 1-VII for manual wheeled mobility systems. Complete Sections 1-IX for power wheeled mobility systems. Complete the Home Health/CCP Measuring Worksheet for all requests.

### Client Information

| | |
|---|---|
| First name: Linda | Last name: Puglisi |
| Medicaid number: ▓▓▓▓ | Date of birth: ▓▓▓▓ |
| Diagnosis: Spinal Cord Injury | |
| Height: 5'8" | Weight: 125 |

### I. Neurological Factors

Indicate client's muscle tone: Hypertonic ☐ Absent ☒ Fluctuating ☐ Other

Describe client's muscle tone: Linda has increased tone in RUE and RLE, which fluctuates and causes spasms at times. Spasticity is present throughout the RUE and RLE in anterior and posterior musculature of the elbow, wrist, fingers and hip, as well as shoulder internal rotators, knee extensors, and plantar flexors. An increase in muscle tone is present in L hip adductors, knee flexors, and ankle plantar flexors. Decreased muscle tone is noted in proximal LUE musculature.

Describe active movements affected by muscle tone: Linda demonstrates little active movement in the RUE and RLE. She is able, however to use the L side of her body actively, although range of motion is limited throughout. She is able to push through both legs during transfers, and can partially flex her L knee. In the UEs, Linda has no active movement throughout the RUE or L shoulder and is not able to supinate. She does have active movement within normal limits distally, in elbow extensors, and for wrist & finger flexion/extension.

Describe passive movements affected by muscle tone: Passive movements affected by muscle tone include bilateral shoulder flexion and extension, shoulder abduction, external rotation, and bilateral hip abduction and ankle dorsiflexion.

 Effective Date 07/01/201 1/Revising Date 03/12/2011

44

000063

Describe reflexes present: Throughout all therapy sessions, Linda has not demonstrated any protective or postural reflexes.

## II. Physical Control

| | | | | |
|---|---|---|---|---|
| Head control: | ☒ Good | ☐ Fair | ☐ Poor | ☐ None |
| Trunk control: | ☐ Good | ☐ Fair | ☒ Poor | ☐ None |
| Upper extremities: | ☐ Good | ☐ Fair | ☒ Poor | ☐ None |
| Lower extremities: | ☐ Good | ☐ Fair | ☒ Poor | ☐ None |

## III. Medical/Surgical History and Plans

Is there history of decubitis/skin breakdown?   ☐ Yes   ☒ No
*If yes, please explain:*

Describe orthopedic conditions and/or range of motion limitations requiring special consideration (i.e., contractures, degree of spinal curvature, etc.): Given lack of trunk control, consideration must be made for a back that provides stable and consistent neutral alignment of the spine to prevent rotation or curvature secondary to positioning. Linda's significantly decreased hip ROM requires she have a cushion that provides reliable ischial positioning to prevent imbalanced weightbearing. Given Linda's spinal cord injury, she is at increased risk for bone density loss and compromised soft tissue integrity secondary to not being able to bear weight through BLEs.

Describe other physical limitations or concerns (ie., respiratory): Patient has impaired integumentary sensation, respiratory function, neurogenic bowel, and neurological pain.

Describe any recent or expected changes in medical/physical/functional status: There are no recent or expected changes in medical status. Patient has regained some muscle function since the onset of her injury; therefore her functional status may change over time.

If surgery is anticipated, please indicate the procedure and expected date: No surgery is anticipated at this time.

## IV. Functional Assessments

45

000064

| Ambulatory status: | ☒ Nonambulatory | ☐ With assistance |
|---|---|---|
| | ☐ Short distances only | ☐ Community ambulatory |

| Indicate the client's ambulation potential: | ☐ Expected within 1 year<br>☒ Not expected<br>☐ Expected in future within years |
|---|---|

**IV. Functional Assessment**

Wheelchair Ambulation:
Is client totally dependent upon wheelchair? ☒ Yes ☐ No
*If no, please explain:*

| Indicate the client's transfer capabilities: | ☒ Maximum assistance | ☐ Moderate assistance |
|---|---|---|
| | ☐ Minimum assistance | ☐ Independent |

Is the client tube fed? ☐ Yes ☒ No
*If yes, please explain:*

| Feeding: | ☒ Maximum assistance | ☐ Moderate assistance |
|---|---|---|
| | ☐ Minimum assistance | ☐ Independent |
| Dressing: | ☒ Maximum assistance | ☐ Moderate assistance |
| | ☐ Minimum assistance | ☐ Independent |

Describe other activities performed while in wheelchair. Grooming and hygiene activities, UE dressing, verbal and technological communication, voiding, and therapeutic activities including ROM, strengthening, and weightbearing activities are all completed by Linda in the wheelchair.

**V. Environmental Assessment**

Describe where client resides: a first-floor, handicap accessible apartment in the Houston area.

| Is the home accessible to the wheelchair? ☒ Yes ☐ No |
|---|

| Are ramps available in the home setting? ☒ Yes ☐ No |
|---|

Describe the client's educational/vocational setting: Linda is unemployed secondary to her disability.

| Is the school accessible to the wheelchair? ☐ Yes ☒ No |
|---|

Page 3 of 7                                                  Effective Date 070120111/Revised Date 05212014

46

Are there ramps available in the school setting? ☐ Yes ☒ No

If client is in school, has a school therapist been involved in the assessment? ☐ Yes ☒ No

Name of school therapist: N/A

Name of school: N/A

---

**V. Environmental Assessment**

School therapist's telephone number: N/A

Describe how the wheelchair will be transported: N/A

Describe where the wheelchair will be stored (home, and/or school): home

Describe other types of equipment which will interface with the wheelchair: a Left Mobile Arm Support will interface with the Wheelchair, enabling her to perform grooming and hygiene activities and therapeutic exercises. A sliding board will interface with the wheelchair during transfers, as well as her hospital bed, and tub bench. Linda uses her mobile phone by using the armrest of the wheelchair to support it while she operates the phone with her distal L fingertips.

---

**VI. Requested Equipment**

Describe client's current seating system, including the mobility base and the age of the seating system: Linda does not currently own a seating system.

Describe why current seating system is not meeting client's needs: N/A

Describe the medical necessity for mobility base and seating system requested:
Determined via extensive trials, the seating system clinically recommended for Linda includes:

Permobile C500 VS Stander power mobility base, required to enable functions of the wheelchair as a whole and thus allow Linda to maneuver within her home independently in a safe and reliable manner. 17" seat width, 22" seat depth according to clinical measurements listed below.

R-net remote joystick, color display with mono-jacks (mounted on the left, as Linda has active use of these fingers using her DIP joints) to allow Linda to operate the wheelchair in all directions and engage the power, tilt, recline, and standing features.

R-net retractable joystick mount attaches the joystick to the wheelchair for operation.

Expandable control with harness is required to operate more than one power seat function. The expandable control with harness allows the control unit to move to the side so that it does not hit/damage

47

000066

counter tops, desks, and other work surfaces during functional tasks.

Power tilt and recline features enable her to perform her own pressure relief with proper frequency and duration to prevent prolonged weight bearing through ischials and prevent skin breakdown.

Multi-Seat Control Function Kit with Toggle Switches: required with more than one power seat function. Linda is able to use her DIPs to operate the toggle switches for power functions.

Sliding backrest kit with sliding backrest hardware: required to reduce friction/shear when using power standing feature and power recline. Sliding backrest hardware is required to mount after-market backrest.

Corpus Armrests - 4"x16" with bilateral elbow blocks and right outer armrest support. The elbow blocks keep both elbows from falling off or catching on the armrests posteriorly. The right outer armrest keeps her R elbow from falling off and sliding off the side of the armrest; preventing risk of injury. This occurs frequently without an outer armrest in place.

Power Elevating, Articulating, Center-mount foot platform (1-piece): required for transfers in and out of the wheelchair, weightbearing, neutral postural alignment and safe mobility within the home.

Knee blocks: required for use with standing feature for safety.

Standard, non-padded, medium, push-button hip positioning belt to maintain hips in wheelchair seat as well as prevent falling/sliding out of wheelchair.

6" x 6" hip guides with removable hardware: necessary to keep hips and lower extremities in neutral alignment in sitting and standing.

Adjustable chest bar (16" wide): necessary for use with standing feature to prevent patient from falling forward.

Bodypoint Monoflex Chest Strap (medium): recommended as a safety feature during standing, and during transportation when riding in the wheelchair.

Stealth Comfort Plus headrest (10" wide) with removable hardware to maintain cervical alignment and prevent injury in tilt during pressure reliefs.



Power seat elevator: required when using standing feature. Power seat elevator will also decrease caregiver burden when assisting the patient with lateral transfers by adjusting the seat height to make the transfer downhill. The seat elevator allows for Linda to access items in upper cabinets and countertops that she would otherwise be unable to reach. Patient may also use seat elevator to improve independence with and functional reach activities as her neurological function continues to improve.

Standing feature: The standing feature allows Linda to bear weight through BLEs as necessary to prevent bone density loss and preserve integrity of soft tissue structures such as ligaments and tendons. The standing feature also allows her access to items necessary for everyday (I)ADL activities. Linda is able to perform toileting with set-up only from supported standing with the use of a female urinal.

16" wide, 16" tall Matrix elite deep backrest provides stable postural support to prevent rotation of the trunk and curvature of the spine. The height of the backrest gives needed support throughout the length

Page 6 of 7                                    Ritacive Date 070 1201 1/Rowised Date 0031 2011

48



000067

of Linda's thorax, and the depth of this model prevents collapsing of either side of her ribcage, enhancing respiration and preserving the correct alignment of her spine. These elements together maintain Linda's trunk in a safe, neutral posture so that she will not require frequent repositioning. It is important her seating system provide for her postural, positioning, and mobility needs as she has no one living in the home to rely on to provide this care.

18"x 20" Invacare Stabilite cushion provides adequate femoral support to prevent abduction of the thighs in sitting, as well as ischial positioning in the rear of the seat, which prevents Linda's pelvis from tilting posteriorly (which would increase pressure throughout the sacral region, and increase malaligned curvature of the spine). The gel overlay in this region of the seat provides added skin protection and comfort.

Describe the equipment requested: Determined via extensive trials, the seating system clinically recommended for Linda includes:

Permobile C500 VS Stander power mobility base
R-net remote joystick, color display with mono jacks (mounted on the left)
R-net retractable joystick mount
Expandable control with harness
Power tilt and recline
Multi-Seat Control Function Kit with Toggle Switches
Sliding backrest kit with sliding backrest hardware
17" seat width, 22" seat depth
Corpus Armrests – 4"x16" with bilateral elbow blocks and right outer armrest support
Power Elevating, Articulating, Center-mount foot platform (1-piece)
Knee blocks: required for use with standing feature
Standard, non-padded, medium, push-button hip positioning belt
6"x5" hip guides with removable hardware
Adjustable chest bar (16" wide)
Bodypoint Monoflex Chest Strap (medium)
Stealth Comfort Plus headrest (10" wide) with removable hardware
Power seat elevator
16" wide, 16" tall Matrix elite deep backrest
17" x 20" Invacare Stabilite cushion

Describe the growth potential of equipment requested in number of years: Linda has lost approximately 5 pounds since the date of injury. Her weight is maintained via nutritional intake and consistent participation in therapeutic activities recommended by her medical team. It is not anticipated that Linda will gain or lose a substantial amount of weight throughout the lifetime of the seating system.

Describe any anticipated modifications/changes to the equipment within the next three years: There are no modifications or changes anticipated to the equipment requested within the next three years.

VII. Signatures of Therapist/Physician and Qualified Rehabilitation Professional (QRP)

| Physician/Therapist's name: Leslie Ott | Physician/Therapist's signature: |
|---|---|
| Physician/Therapist's title: Occupational Therapist | Date: 2/18/13 |
| Physician/Therapist's telephone number: (713 ) 797 - 7377 | |
| Physician/Therapist's employer (name): | Physician/Therapist's address (work or employer |

49

000068

| TIRR Memorial Hermann | address): 1333 Moursund Ave Houston, TX-77080 |
|---|---|

| QRP Name: Michael Duenas | NPI: 16465441 | TPI: 3210558 06 |
|---|---|---|
| QRP Signature: _____ | Date: 2 8 03 | |

**VII. POWER WHEELCHAIRS**
*Complete if a power wheelchair is being recommended.*

Describe the medical necessity for power vs. manual wheelchair:
*(Justify any accessories such as power tilt or recline)*
Linda lacks the active movement, strength, endurance, motor and postural control to propel a manual wheelchair of any kind. She is unable to perform her own weightshifts and does not have family or caregiver in the home to provide for her mobility, functional, ADL, and pressure relief needs, therefore a power wheelchair with tilt and standing features is recommended for her daily use. With a power seating system of this kind, Linda will be able to provide for her mobility and functional needs to access items and perform ADL and household tasks in a safe and effective manner. She will also be able to independently perform pressure relief and weight bearing through her LEs, preventing skin breakdown and bone density loss, as well as enhancing biomechanical alignment throughout the entire body on a daily basis, which helps to prevent further impact of spasticity on joints in upright postures.

Is client unable to operate a manual chair even when adapted? ☒ Yes ☐ No

Is self propulsion possible but activity is extremely labored? ☐ Yes ☒ No
*If yes, please explain:*

Is self propulsion possible but contrary to treatment regimen? ☐ Yes ☒ No
*If yes, please explain:*

How will the power wheelchair be operated (hand, chin, etc.)? L hand

Has the client been evaluated with the proposed drive controls? Yes

Does the client have any condition that will necessitate possible change in access or drive controls within the next five years? No

Is the client physically and mentally capable of operating a power wheelchair safely and with respect to others?
☒ Yes ☐ No

Is the caregiver capable of caring for a power wheelchair and understanding how it operates?
☒ Yes ☐ No

How will training for the power equipment be accomplished? Linda has been trialing a power wheelchair with similar dimension and control units during her admission at the hospital. She has demonstrated the ability to safely operate the seating system in straight ways, elevators, ramps, forward, reverse, turning R, L up to 360°, in crowded areas and on uneven surfaces.

**IX. Signatures of the Referring Physician and Qualified Rehabilitation Professional (QRP)**

| Physician/Therapist's name: Leslie Ott | Physician/Therapist's signature: |
|---|---|
| | Leslie Ott, OTR/LOT |

Page 7 of 7                                          Effective Date 0701201 1/Revised Date 00512011

50

## Home Health/CCP Measuring Worksheet

| General Information | |
|---|---|
| Client's name: Linda Puglisi | Date of birth: ~~████████~~ |
| Client's Medicaid number: ~~████████~~ | Height: 5'8" |
| Date when measured: 1/31/2013 | Weight: 128 |

| Measurements | | |
|---|---|---|
| | 1: 31.5" | Top of head to bottom of buttocks |
| | 2: 21" | Top of shoulder to bottom of buttocks |
| | 3: 15" | Arm pit to bottom of buttocks |
| | 4: 8" | Elbow to bottom of buttocks |
| | 5: 20.5" | Back of buttocks to back of knee |
| | 6: 11" | Foot length |
| | 7: 5.5" | Head width |
| | 8: 15" | Shoulder width |
| | 9: 11.5" | Arm pit to arm pit |
| | 10: 17.5" | Hip width |
| | 11: 16.5" | Distance to bottom of left leg (popliteal to heel) |
| | 12: 16.5" | Distance to bottom of right leg (popliteal to heel) |

| Additional Comments | |
|---|---|

| Signature of the Therapist or Qualified Rehabilitation Professional | | |
|---|---|---|
| Measurer's Name: Michael Dueñas | | |
| Measurer's Signature: | Date: | 2/18/13 |
| Measurer's Telephone number: (281) 971 - 9855 | | |
| QRP Name: MICHAEL S. DUEÑAS | | |
| QRP Signature: | Date: | 2/18/13 |

51

000070

| Physician/Therapist's title: Occupational Therapist | Date: 2/18/13 |
|---|---|
| Physician/Therapist's telephone number: (713) 797 - 7577 | |
| Physician/Therapist's employer (name): TIRR Memorial Hermann | Physician/Therapist's address (work or employer address): 1333 Moursund Ave, Houston, TX 77030 |
| QRP Name: _Microael S. Duarte_ | NPI: 11546154 541  TPI: 0810358-06 |
| QRP Signature: _____ | Date: 2/18/13 |

Page 6 of 7  Effective Date 07/01/201 1 Revised Date 03/18/2011

52

000071

# TAB 4

☒031/068

Assistive Technology®, 21:161–168, 2009
Copyright ©2009 RESNA
ISSN: 1040-0435 print/1949-3614 online
DOI: 10.1080/10400430903175022

 Taylor & Francis

# RESNA Position on the Application of Wheelchair Standing Devices

Julianna Arva, MS, ATP,[1]
Ginny Paleg, PT,[2] Michelle
Lange, OTR, ABDA, ATP,[3]
Jenny Lieberman, MSOTR/L,
ATP,[4] Mark Schmeler, PhD,
OTR/L, ATP,[5] Brad Dicianno,
MD,[6] Mike Babinec, OTR/L,
ABDA, ATP,[7] and Lauren
Rosen, PT, MPT, ATP[8]
[1]TiSport LLC, Kennewick,
Washington
[2]Independent Consultant,
Maryland
[3]Children's Hospital of Denver,
Denver, Colorado
[4]Mount Sinai Hospital,
New York, New York
[5]University of Pittsburgh,
Pittsburgh, Pennsylvania
[6]University of Pittsburgh
Medical Center, Pittsburgh,
Pennsylvania
[7]Invacare Corp, Elyria, Ohio
[8]St. Joseph's Children's
Hospital, Tampa, Florida

ABSTRACT   This document, approved by the Rehabilitation Engineering &
Assistive Technology Society of North America (RESNA) Board of Directors
in March 2007, shares typical clinical applications and provides evidence from
the literature supporting the use of wheelchair standers.

KEYWORDS   power features, rehabilitation, standing, wheelchair

## INTRODUCTION

The purpose of this article is to share typical clinical applications as well as
provide evidence from the literature supporting the application of wheelchair
standing devices to assist practitioners in decision making and justification. It
is not intended to replace clinical judgment related to specific client needs.

## BACKGROUND

Clinical experience suggests that wheelchair users often experience painful,
problematic, and costly secondary complications due to long-term sitting.
Standing is an effective way to counterbalance many of the negative effects of
constant sitting (Dunn et al., 1998; Eng et al., 2001). Standers integrated into
wheelchair bases enhance the beneficial effects of standing since they allow for
more frequent, random, and independent performance of standing than among
persons who use standing devices outside of a wheelchair base. Integration of
this feature into the wheelchair base also enables standing to enhance func-
tional activities.

It is RESNA's position that wheelchair standing devices are often medically
necessary, as they enable certain individuals to:

- Improve functional reach to enable participation in activities of daily living
  (ADLs) (e.g., grooming, cooking, reaching medication)
- Enhance independence and productivity
- Maintain vital organ capacity
- Reduce the occurrence of urinary tract infections (UTIs)
- Maintain bone mineral density
- Improve circulation
- Improve passive range of motion

Address correspondence to Julianna
Arva, MS, Roskovics u.6, I/I, Budapest
1122, Hungary.
E-mail: jarva@tilite.com

161

000080

032/068

> Reduce abnormal muscle tone and spasticity
- Reduce the occurrence of pressure sores
- Reduce the occurrence of skeletal deformities
- Enhance psychological well-being

Special precautions must be exercised when utilizing standers in order to avoid the risk of injuries such as fractures. A licensed medical professional (physical or occupational therapist) must be involved with assessment, prescription, trials, and training in the use of the equipment.

## Definitions

A standing feature integrated into a wheelchair base allows the user to obtain a standing position without the need to transfer from the wheelchair. A mechanical or electromechanical system manipulated via levers or the wheelchair's controls moves the seat surface from horizontal into a vertical or anteriorly sloping position while maintaining verticality of the legrests and back-rest, thus extending the hip and knee joints. A full vertical standing position can be achieved directly from sitting, through gradual angle changes from a laying position, or a combination of these positions. Most wheelchair standers allow for full or partial extension of the hip and knee joints and full upright or partially tilted positions. Wheelchair standers are available on manual or power wheelchair bases. Wheelchair standing devices address the medical and functional needs described in the sections to follow.

## Functional Reach and Access to ADLs

Standing adds a significant amount of vertical access. Since the seating surface moves into a vertical position, typically the amount of additional vertical access equals the user's seat depth. This allows people to access kitchen cabinetry, light switches, microwaves, mirrors, sinks, hangers, thermostats, medicine cabinets, and many other surfaces to enhance their abilities to perform ADLs, depending on their upper extremity function. An integrated wheelchair stander system allows for moving about while in a standing position, and standing can become an integral and functional part of the day and the user can perform a variety of ADLs while in the standing position, combining functional and medical benefits. A standing position can be assumed as needed, both for indoor and outdoor

activities—it can aid productivity and integration at work, school, church, or enhance independence, such as when shopping for groceries. Being able to perform standing from one's wheelchair also minimizes transfers, thereby enhancing safety, conserving energy, and reducing dependency. Research suggests that in addition to expense and lack of awareness, the major reasons for not using stationary standers for wheelchair users with spinal cord injuries (SCIs) are time constraints, lack of assistance, and/or lack of space for an extra device (Eng et al., 2001).

## Passive Range of Motion, Contractures

Standing extends the hip and knee joint to provide position change. Animal studies have shown that muscles fixed in a flexed position result in increased contractures of the joints, especially when the bones are still growing (Trudel & Uhthoff, 2000; Trudel et al., 1999). Many people in wheelchairs have limited access to therapy or caregivers who can provide the necessary amount of ranging; standers integrated with the wheelchair base allow them to perform this important activity on their own and with higher frequency. Standing, however, should not be considered as a substitute for therapy.

## Vital Organ Capacity

During standing, the pelvis tends to assume a more anterior tilt or neutral position, allowing for an increase in lumbar lordosis as compared to sitting. This in turn helps establish a better alignment of the spine and extend the upper trunk. Extension of the upper trunk results in reduced pressure on the internal organs, thereby enhancing respiratory and gastrointestinal capacity and functioning. This can prevent or delay many of the secondary complications so often seen in wheelchair users.

- *Respiration:* Many users experience improved lung capacity when standing often. Studies have shown that those who stand frequently in standing power wheelchairs have lesser or delayed occurrence of respiratory complications and improved respiratory volume (Eng et al., 2001). Standing can also help reduce congestion and coughing (Stainsby & Thornton, 1999).

J. Arva et al.

162

000081

• *Gastrointestinal problems:* Standing wheelchairs users also experience lesser or delayed occurrence of gastrointestinal complications, for example via improvement in gastric emptying (Dunn et al., 1998; Eng et al., 2001).

• *Bowel function:* Some users have experienced improved bowel regularity, reduced constipation, and lesser occurrence of accidental and unregulated bowel movements as a consequence of using wheelchair standers (Dunn et al., 1998). Elimination of chronic constipation and significant reduction in bowel care time have also been shown as a result of frequent standing (Eng et al., 2001; Hoenig et al., 2001). Chronic constipation can lead to bowel obstruction, a dangerous condition often requiring surgery. Unregulated bowel movements can lead to fecal incontinence at a time when the client cannot be cleaned by a caregiver, increasing the risk of developing pressure sores.

• *Increased bladder emptying:* Users of standing devices have reported that they are able to empty their bladders more completely than prior to using the device (Dunn et al., 1998).

## Urinary Tract Infections

UTIs are the third most frequent complication for clients with SCIs and a frequent secondary complication for many other wheelchair users (McKinley et al., 1999). Prolonged immobility causes hypercalcemia, increased urinary calcium output, and also reduces bladder emptying (Issekutz et al., 1966). By reducing contributing risks, standing wheelchairs have been shown to reduce the occurrence of UTIs, which could lead to kidney infections (Dunn et al., 1998).

## Bone Mineral Density

Many wheelchair users experience significant reduction in bone mineral density (BMD) due to the lack of weight bearing in the lower extremities. In fact, without gravitational or mechanical loading of the skeleton, there is a rapid and marked loss of bone. This results in osteoporosis and risk of fractures. Research suggests that weight bearing is superior to nutritional supplements in preventing BMD loss and that the mechanical loading of the bones should be dynamic for full prevention of BMD loss. It also appears that with discontinuation of the weight-bearing program,

BMD levels will continue to decrease and/or return to pre-weight-bearing values.

While stationary standers lessen the loss of BMD, wheelchair standers may actually eliminate BMD loss altogether, given their ability to provide dynamic weight bearing through the lower extremities. Populations with a variety of disabilities have been studied for loss of BMD, such as children with cerebral palsy or spina bifida, as well as adults with stroke, multiple sclerosis, and SCIs (Thompson et al., 2000). Even if BMD loss has not yet occurred in a user, standing can be an effective means to help prevent this secondary complication.

• *Loss of BMD:* Review studies establish the direct relationship between weightlessness and loss of BMD, as well as the relationship between osteoporosis and a high risk of fractures (Ehrlich & Lanyon, 2002; Martin & Houston, 1987; Martin & McCulloch, 1987). Studies with astronauts and people in bed rest quantify the negative effect of weightlessness and lack of weight bearing on BMD (Lutz et al., 1987; Mazess & Whedon, 1983; Whedon, 1982, 1985; Whedon et al., 1976). This can be as high as 36% loss of the cross-sectional area of a non-weight-bearing bone within a month (Lanyon et al., 1986). In bedrest, the average urinary calcium loss at the peak is about 150 mg per day, which corresponds to 0.5% of total body calcium (Deitrick et al., 1948; Donaldson et al., 1970; Hangartner, 1995). For people with disabilities, numerous studies point out the benefits of frequent passive standing and weight bearing/exercise for BMD (Goemaere et al., 1984; Kaplan et al., 1978, 1981; Kunkel et al., 1993).

• *Fractures and loss of independence:* Loss of BMD leads to osteoporosis and the consequent risk of fractures. Articles on children with osteogenosis imperfecta recommend frequent standing in childhood to maximize adulthood independence by minimizing fractures and the likelihood of broken bones (Binder et al., 1984; Bleck, 1981). Many people with disabilities often heal slower as well. Fractures may limit short- and long-term function.

• *Supplements:* Evidence suggests that while appropriate nutritional supplements may reduce calcium loss from the bones, mechanical loading is superior to supplements for BMD maintenance (Lanyon et al., 1986). Dietary changes, such as increased intake of calcium and/or vitamin D, have not proven effective at minimizing disused bone loss (Sinaki, 1995).

163

*Wheelchair Standing Devices*

000082

- *Mechanical weight loading:* Living bones constantly adapt themselves to the mechanical forces applied to them, and their structure is directly linked to their weight-bearing activity and forces occurring due to movement against resistance (Simkin & Ayalon, 1990). Weight-bearing activity can be thought of as any activity that is done while upright, requiring the bones to partially or fully support the body's weight against gravity (Bonnick, 1994). Impact-loading, weight-bearing activity therefore involves some impact or force being transmitted to the skeleton during weight bearing. Standing provides mechanical loading through the longitudinal axes of the lower extremity bones. When the body is upright and extended, the bones of the lower extremities carry the entire weight of the body, and therefore loading is most efficient. Since the lower extremities normally carry the entire body's weight, they are the most prone to bone degeneration due to reduced or limited weight bearing.

- *Dynamic loading:* Further studies clarify that standing should be dynamic (higher multitude and varied magnitude) in order to fully prevent loss of BMD. According to the scientific literature, static loading is less efficient than dynamic loading in prevention of BMD loss (Fritton et al., 2000; Lanyon, 1986; Lanyon & Rubin, 1984; McLeod et al., 1988; Rubin & Lanyon, 1984). A recent study of children with disabling conditions found that a 6-month standing program with a stationary stander still resulted in BMD reduction (of 6.3%), while utilizing vibrating plates underneath the standers actually increased BMD (by 11.9%) in the subjects (Ward et al., 2004). This is of utmost importance regarding standing wheelchairs, since they offer dynamic loading in a variety of ways. When using a mobile wheelchair base during standing, vibration occurs due to the movement of the wheelchair applying dynamic loads to the bones of the lower extremities. In addition, small obstacles (e.g., carpet edges, door thresholds, tile edges) provide dynamic input when the user drives over them. Standers integrated with a wheelchair base also allow for frequent loading of the bones throughout the day simply via partial standing.

- *Maintenance of weight bearing:* For the weight-bearing exercise to be effective, the mechanical stress placed on the bone must exceed the level to which the bone has adapted (i.e., short periods of intense loading can produce more new bone than long-term routine

loading) (Frost, 1990). However, long-term routine loading is important in maintaining bone density. And—although bone responds to mechanical loading, it is easier to lose bone through inactivity than to gain more through changes in functional loading. When weight-bearing exercise is not continued, bone mass reverts to pretraining levels (Dalsky et al., 1988; Drinkwater, 1994). With standers integrated into a wheelchair base, the user is not dependent on circumstances (such as caregiver availability) to continue standing. Consequently, maintenance of a standing program and higher frequency of standing are more likely. Additionally, integrated standers allow for standing nearly any time for any length of time, and therefore weight loading is more likely to be of random distribution, which appears to be superior in BMD loss prevention.

## Circulation

Users have also experienced improvement in lower extremity circulation as a consequence of utilizing a wheelchair stander (Eng et al., 2001). One benefit is reduced swelling in the legs and feet.

## Tone

Wheelchair standers also aid in reduction of excess muscle tone; research indicates that muscle stretch combined with weight loading reduces muscle tone more than stretching alone (32% vs. 17%) (Odeen & Knutsson, 1981). Some users experience tone reduction in their upper extremities due to better skeletal alignment in a standing position. This may translate into improved speech and better hand and arm function to perform ADLs. Tone reduction can improve comfort, minimize further range of motion losses, improve function, and conserve energy.

## Spasticity

Studies show that standing wheelchair users have experienced significant reduction in spasticity (Dunn et al., 1998; Eng et al., 2001). This helps with transfers, can aid in better sleep, reduces fatigue and pain, and improves positioning in the wheelchair. Standing has an immediate and significant effect on spasticity (Bohannon, 1993).

*J. Arva et al.*

164

000083

## Pressure Sores

When fully standing, pressure is completely relieved off the ischial tuberosities (ITs). However, when tilting or reclining, there is only partial redistribution of pressure underneath the ITs (Aissaoui et al., 2001; Hobson, 1992). Pressure ulcers are the primary complication for people with SCIs and many other adults who sit in wheelchairs all day long (McKinley et al., 1999). There is evidence that users have suffered fewer pressure sores while using standers or integrated wheelchair standers (Dunn et al., 1998; Eng et al., 2001; Hobson, 1992).

## Skeletal Deformities

Clinical experience suggests that extension of the upper trunk and proper alignment of the hip during standing help delay typical skeletal deformities often seen in people who sit in a wheelchair for long periods of time, such as fixed posterior pelvic tilt, kyphosis and scoliosis of the spine, and windswept deformities of the lower extremities. During standing, the head of the femur usually ends up better seated in the acetabulum, which is important especially for children to promote healthy skeletal alignment as well as to promote proper development of the acetabular socket.

## Community Environments, Vocational and Recreational Benefits

Integrated wheelchair standers can benefit users in a variety of community settings to enhance their independence, improve vocational activities, and enable recreational activities. Examples include but are not limited to the following:

- Improved ability to reach higher shelves in grocery stores and other shopping facilities
- Ability to access vending machines, payphones, high elevator buttons, coffee shop counters, and so forth
- Improved ability to stand up to access fax machines, drawers, client files, and other necessities at work
- Ability to be employed in certain jobs that need to be performed from a standing position (e.g., hotel receptionist, clerical or medical worker, hair stylist)
- Enhanced ability to engage in recreational activities (o.g., standing up with others in a ball game).

## Additional Benefits

Additional benefits of utilizing an integrated wheelchair standing system include but are not limited to:

- Fatigue is reduced due to the benefits mentioned earlier, thereby prolonging tolerance in terms of staying in the wheelchair for longer periods of time.
- Some male users can use a public urinal independently as opposed to transferring to a toilet or using catheterization.
- The need for attendant care is reduced by lessening the need to transfer in and out of the wheelchair and improving the ability to range independently and perform ADLs.
- Back pain and risk of injury are reduced among caregivers by minimizing the amount of transfers they need to perform.
- Partial standing provides an anteriorly sloped femur position, which can translate into a better pelvic alignment and enhanced lumbar lordosis. Clinical experience suggests that some clients find this position improves their alertness and/or their upper extremity function.
- Many children who use mobility equipment throughout the day are on intensive standing programs. They often have a stander at school and one at home. Integrating standing into the wheelchair base reduces the necessary amount of equipment and ensures more frequent and independent initiation of standing.
- Standing up with a tilt table function (gradual angle change into upright) may help alleviate problems with orthostatic hypotension, especially after prolonged bedrest.

## Psychosocial Indications

A standing position can lend wheelchair users a heightened sense of confidence and equality by enabling eye-to-eye conversations with the nondisabled society. Many everyday and special occasions in our society require standing, such as citing of the Pledge of Allegiance at school, graduations, weddings, demonstrations, introductions to other people, and religious services. When a person is allowed to stand with everyone else (via an integrated wheelchair standing device), there is a much better sense of integration and the disability becomes less visible, self-esteem is enhanced, acceptance by others is perceived to be higher, and depression is often reduced.

165

*Wheelchair Standing Devices*

000084

## Contraindications

In spite of the numerous benefits, a standing wheelchair might be contraindicated without appropriate assessment. Not everybody is an appropriate candidate for standing. Some contraindications and precautions include but are not limited to:

- *Existing contractures:* The client may benefit from partial weight bearing even if he or she already has fixed contractures of the lower extremities. However, the amount of extension may have to be limited mechanically or electronically, especially in the case of a client without sensation. A wheelchair stander is a powerful device and may cause harm if attempting to overstretch contracted muscles.
- *Skeletal deformities:* Both the sitting and the standing position have to provide appropriate support for stability and function, so special accommodations may have to be provided for people with significant deformities, especially if those deformities are not flexible. Skeletal alignment should be carefully observed while standing.
- *Lack of standing tolerance:* If the client has not been standing for a significant amount of time (schedules vary by person and circumstances), it is necessary to obtain a physician's approval and test a stander to assess standing tolerance. Prior examinations might be warranted, such as X-rays and bone density assessments.
- *BMD loss:* Existing BMD loss and osteoporosis might cause fractures if attempting to stand prematurely and without a well-designed progressive standing program.
- *Postural hypotension:* Blood pressure and dizziness should be checked while standing up, especially for new clients with recent injuries.
- *Sacral shearing:* Some amount of sacral shearing might occur while standing up or sitting down; attention must be paid to skin integrity in the sacral region.
- *Adaptive or custom seating:* Standing systems will not work with one-piece seating systems (as the seat to back angle changes) or highly contoured seating systems due to shear.

## Frequency of Standing

Frequency and duration of standing routines are recommended on an individual basis. They vary by tolerance, fatigue, level of current BMD, and functional goals. In general, standing is recommended as

*J. Arva et al.*

long and as often as the user can tolerate comfortably to increase the benefits. Standers integrated into wheelchair bases allow for spontaneous and frequent utilization of standing.

## SUMMARY

It is RESNA's position that wheelchair standing devices are medically beneficial for wheelchair users by enabling them to reach, improving ADL abilities, enhancing independence and productivity; maintaining vital organ capacity, bone mineral density, circulation, and range of motion, reducing tone and spasticity and the occurrence of pressure sores and skeletal deformities; and enhancing psychosocial well-being.

## CASE EXAMPLES

J. D. is a 19-year-old male with spastic atheroid quadriplegic cerebral palsy. He has been driving a power wheelchair for mobility since he was 6. A power wheelchair with a standing feature was prescribed to him due to the need for frequent standing, functional goals, to enhance independence, and to reduce his mother's back pain, which she developed due to frequent transfers. After 6 months of use, a marked improvement was noted in his upper extremity function, his speech and swallowing, as well as his comfort and tolerance with respect to staying in the wheelchair all day.

Larry is a 65-year-old man with multiple sclerosis for the last 15 years. On initial evaluation, he was experiencing significant problems with lower extremity spasticity that interfered with his ability to sit in a wheelchair and to be transferred with the assistance of his wife. He was using a manual wheelchair with a limited seating system and was developing a severe kyphosis of the spine. He also had issues with bowel and bladder control, lower extremity edema, and poor affect. Following careful assessment and an extensive trial of a stander, he was provided with a power wheelchair equipped with a passive stander as well as tilt in space, reclining backrest, and elevating legrests. At a 6-month follow-up assessment, he reported standing four to six times per day for 15 to 30 minutes. He was observed to have significantly decreased lower extremity spasticity to the point where he was no longer taking anti-spasticity medication. His wife reported this further made transferring him safer and more manageable. It

000085

also allowed him to have improved bed mobility so that he could get a full night's sleep. Moreover, there was no noted edema in his lower extremities, and he reported far fewer bowel and bladder accidents to the point where he was comfortable going out in the community on a weekly basis. He demonstrated improved ability to reach and carry out tasks at different surface heights, was observed to be able to sit more upright with less kyphosis, and demonstrated improved affect.

Mr. D. is a 36-year-old male with a diagnosis of tetraplegia due to a C7 spinal cord injury. He is the primary caretaker of two young boys and works part time as a barber. In the community, he utilizes a rigid frame wheelchair. A manual wheelchair with a standing feature was prescribed for him due to severe complaints of shoulder and upper quadrant pain and decreased upper extremity function caused by repeated overhead activities at home and work. With the manual wheelchair and its standing feature, he was able to work for longer periods of time and care for his children. The standing feature allowed Mr. D. to complete activities in his forward plane. This led to a significant decrease in complaints of shoulder pain and improved upper extremity function.

## ACKNOWLEDGMENTS

This article was developed through RESNA's Special Interest Group in Seating and Wheeled Mobility (SIG-09) and approved by the RESNA Board of Directors. RESNA is an interdisciplinary association of people with a common interest in technology and disability. RESNA's purpose is to improve the potential of people with disabilities to achieve their goals through the use of technology. RESNA serves that purpose by promoting research, development, education, advocacy, and provision of technology and by supporting the people engaged in these activities.

## REFERENCES

Alsahood, R., Lacoste, M., & Dansereau, J. (2001). Analysis of sliding and pressure distribution during a repositioning of persons in a simulator chair. IEEE Transactions on Neural Systems and Rehabilitation Engineering, 9, 215–224.

Binder, H., Hawks, L., Graybill, G., Gerber, N. L., & Weintrob, J. C. (1984). Osteogenesis imperfecta: Rehabilitation approach with infants and young children. Archives of Physical Medicine & Rehabilitation, 65, 537–541.

Bleck, E. E. (1981). Nonoperative treatment of osteogenesis imperfecta: Orthotic and mobility management. Clinical Orthopaedics & Related Research, 159, 111–122.

Bohannon, R. W. (1993). Tilt table standing for reducing spasticity after spinal cord injury. Archives of Physical Medicine & Rehabilitation, 74, 1121–1122.

Bonnick, S. L. (1994). The osteoporosis handbook. Dallas: Taylor Publishing.

Dalsky, G., Stocke, K., Ehsani, A., Slatopolsky, E., Lee, L. E., & Birge, S. J (1988). Weight-bearing exercise training and lumbar bone mineral content in postmenopausal women. Annals of Internal Medicine, 108, 824–828.

Dietrick, J., Whedon, G., & Short, E. (1948). Effects of immobilization upon various metabolic and physiologic functions of normal men. American Journal of Medicine, 4, 3.

Donaldson, C. L., Hulley, S. B., Vogel, J. M., Hattner, R. S., Bayers, J. H., & McMillan, D. E. (1970). Effect of prolonged bed rest on bone mineral. Metabolism, 19, 1071.

Drinkwater, B. L. (1994). 1994 C. H. McCloy Research Lecture: Does physical activity play a role in preventing osteoporosis? Research Quarterly for Exercise and Sport, 65, 197–206.

Dunn, R. B., Walter, J. S., Lucero, Y., Weaver, F., Langbein, E., Fehr, L., et al. (1998). Follow-up assessment of standing mobility device users. Assistive Technology, 10, 84–93.

Ehrlich, P. J., & Lanyon, L. E. (2002). Mechanical strain and bone cell function: A review. Osteoporosis International, 13, 688–700.

Eng, J. J., Levins, S. M., Townson, A. F., Mah-Jones, D., Bremner, J., & Huston, G. (2001). Use of prolonged standing for individuals with spinal cord injuries. Physical Therapy, 81, 1392–1399.

Fritton, S. P., McLeod, K. J., & Rubin, C. T. (2000). Quantifying the strain history of bone: Spatial uniformity and self-similarity of low-magnitude strains. Journal of Biomechanics, 33, 317–325.

Frost, H. M. (1990). Skeletal structural adaptations to mechanical usage (SATMU)—Redefining Wolff's law: The bone modeling problem. The Anatomical Record, 226, 403–413

Goemaere, S., Van Laere, M., De Neve, P., & Kaufman, J. M. (1994). Bone mineral status in paraplegic patients who do or do not perform standing. Osteoporosis International, 4, 138–143.

Hangartner, T. N. (1995). Osteoporosis due to disuse. Physical Medicine and Rehabilitation Clinics of North America, 6, 579–594

Hobson, D. A. (1992). Comparative effects of posture on pressure and shear at the body-seat interface. Journal of Rehabilitation Research and Development, 29(4), 21–31.

Hoenig, H., Murphy, T., Galbraith, J., & Zolkewitz, M. (2001). Case study to evaluate a standing table for managing constipation. Spinal Cord Injury Nursing, 18, 74–77.

Issekutz, B., Jr., Blizzard, J. J., Birkhead, N. C., & Rudahl, K. (1966). Effect of prolonged bed rest on urinary calcium output. Journal of Applied Physiology, 21, 1013–1020.

Kaplan, P. E., Gandhavadi, B., Richards, L., & Goldschmidt, J. (1978). Calcium balance in paraplegic patients: Influence of injury duration and ambulation. Archives of Physical Medicine & Rehabilitation, 59, 447–450.

Kaplan, P. E., Roden, W., Gilbert, E., Richards, L., & Goldschmidt, J. W. (1981). Reduction of hypercalciuria in tetraplegia after weight bearing and strengthening exercises. Paraplegia, 19, 289–293.

Kunkel, C. F., Scremin, A. M., Eisenberg, B., Garcia, J. F., Roberts, S., & Martinez, S. (1993). Effect of "standing" on spasticity, contracture, and osteoporosis in paralyzed males. Archives of Physical Medicine & Rehabilitation, 74, 73–78.

Lanyon, L. E., & Rubin, C. T. (1984). Static vs dynamic loads as an influence on bone remodelling. Journal of Biomechanics, 17, 897–905.

Lanyon, L. E., Rubin, C. T., & Baust, G. (1986). Modulation of bone loss during calcium insufficiency by controlled dynamic loading. Calcified Tissue International, 38, 209–216.

Lutz, J., Chen, F., & Kasper, C. (1987). Hypokenesia-induced negative net calcium balance reverse by weight bearing exercise. Aviation, Space, and Environmental Medicine, 58, 308–314.

Martin, A. D., & Houston, C. S. (1987). Osteoporosis, calcium and physical activity. Canadian Medical Association Journal, 136, 587–593.

Martin, A. D., & McCulloch, R. G. (1987). Bone dynamics: Stress, strain and fracture. Journal of Sports Sciences, 5, 155–63.

167

000086

Ø038/068

Mazess, R. B., & Whedon, G. D. (1983). Immobilization and bone. *Calcified Tissue International, 35,* 265–267.

McKinley, W. O., Jackson, A. B., Cardenas, D. D., & DeVivo, M. J. (1999). Long-term medical complications after traumatic spinal cord injury: A regional model systems analysis. *Archives of Physical Medicine & Rehabilitation, 80,* 1402–1410.

McLeod, K. J., Rubin, C. T., Otter, M. W., & Qin, Y. X. (1998). Skeletal cell stresses and bone adaptation. *American Journal of the Medical Sciences, 316,* 176–183.

Odeen, I., & Knutsson, E. (1981). Evaluation of the effects of muscle stretch and weight load in patients with spastic paraplegia. *Scandinavian Journal of Rehabilitation Medicine, 13,* 117–121.

Rubin, C. T., & Lanyon, L. E. (1984). Regulation of bone formation by applied dynamic loads. *Journal of Bone & Joint Surgery—American Volume, 66,* 397–402.

Simkin, A., & Ayalon, J. (1990). *Bone-loading: The new way to prevent and combat the thinning bones of osteoporosis.* London: Prion.

Sinaki, M. (1995). Musculoskeletal rehabilitation. In B. L. Riggs & L. J. Melton III (Eds.), *Osteoporosis: Etiology, diagnosis, and management* (pp. 435–473). Philadelphia: Lippincott-Raven.

Stninsby, K., & Thornton, H. (1999, Spring). Justifying the provision of a standing frame for home use—A good case to quote. *Synapse,* pp. 3–5.

Thompson, C. R., Figoni, S. F., Devocelle, H. A., Filer-Moeller, T. M., Lockhart, T. L., & Lockhart, T. A. (2000). From the field: Effect of dynamic weight bearing on lower extremity bone mineral density in children with neuromuscular impairment. *Clinical Kinesiology, 54,* 13–18.

Trudel, G., & Uhthoff, H. K. (2000). Contractures secondary to immobility: Is the restriction articular or muscular? An experimental, longitudinal study in the rat knee. *Archives of Physical Medicine & Rehabilitation, 81,* 6–13.

Trudel, G., Uhthoff, H. K., & Brown, M. (1999). Extent and direction of joint motion limitation after prolonged immobility: An experimental study in the rat. *Archives of Physical Medicine & Rehabilitation, 80,* 1542–1547.

Ward, K., Alsop, C., Caulton, J., Rubin, C., Adams, J., & Mughal, Z. (2004). Low magnitude mechanical loading is osteogenic in children with disabling conditions. *Journal of Bone and Mineral Research, 19,* 360–369.

Whedon, G. D. (1982). Changes in weightlessness in calcium metabolism and in the musculoskeletal system. *Physiologist, 25,* 541–544.

Whedon, G. D. (1985). The influence of gravity on calcium metabolism. *Journal of Nutritional Science & Vitaminology, 31*(Suppl.), 541–544.

Whedon, G. D., Lutwak, L., Rambaut, P., Whittle, M., Leach, C., Reid, J., et al. (1976). Mineral and nitrogen metabolic studies on Skylab flights and comparison with effects of earth long-term recumbency. *Life Sciences & Space Research, 14,* 119–127.

000087

# TAB 5

## AFFIDAVIT OF AMY MORGAN, PT, ATP

STATE OF KENTUCKY     §
COUNTY OF BOONE     §

BEFORE ME, the undersigned authority, on this day personally appeared Amy Morgan, who being first duly sworn, states the following:

1. My name is Amy Morgan and the facts to which I attest herein are from my personal knowledge and I am competent to testify as to same.

2. The following statements are based upon my experience in the field of physical therapy and rehabilitation technology. I am a Licensed and Certified Physical Therapist and a certified Assistive Technology Professional (ATP).

3. I am employed by Permobil, Inc., a manufacturer of complex rehabilitation power wheelchairs for over 45 years. I am the National Clinical Education Manager and Standing Specialist with Permobil and am responsible for providing education and training in regards to power mobility and assistive technology, providing clinical feedback to the design team for product features, and assisting the rehab team with a clinical decision making framework to ensure the most appropriate and cost-effective option is being recommended. (Resume, Attachment A)

4. I am very familiar with the Permobil C500 VS wheelchair which enables the user to independently stand at any time and in any location. This wheelchair is unique because the multi-positioning power standing system allows the user's body to be extended before gravity and weight-bearing begin. This is extremely important for users as it allows a customized standing sequence, which will accommodate for any postural control or orthostatic hypotension issues as well as ensure appropriate postural alignment and reduce the risk of shearing and sliding which can compromise skin integrity.

5. The multi-positional standing system (E2301) of the C500 VS must include the following power seat functions for the mechanical operation of this wheelchair:

     (a) Tilt and recline (E1007)
     (b) Center mount articulating elevating legrests (K0108)
     (c) Stand and drive legrest assembly (K0108)
     (d) Seat elevation (E2300)

The tilt/recline and elevating legrests allow the user to fully extend their body in preparation for standing. The stand and drive legrest assembly provides the anterior stability required for safety and balance of the chair while standing, and also allows the chair to move in the standing position. The adjustable seat height ensures stability of the chair by allowing the stand and drive caster wheels to be appropriately in

000293

contact with the ground – creating this anterior stability for safety. The Permobil C500 VS cannot be ordered without the power seat functions listed above and must also include the multiple seat function control kit as it utilizes multiple power seat functions. (E2311)

6. The medical benefits of standing for individuals with spinal cord injuries is well documented. In 2009, the Rehabilitation Society of North America (RESNA) published a peer-reviewed article entitled *RESNA Position on the Application of Wheelchair Standing Devices*, Assistive Technology 21:3,161-168 (Attachment B)

7. This article reviews the scientific and clinical evidence regarding the medical, functional, and psychosocial benefits of wheelchair standing devices and concludes that this type of wheelchair is medically necessary for certain individuals to maintain vital organ capacity, improve circulation and passive range of motion, reduce the occurrence of urinary tract infections, avoid loss of bone mineral density, decrease abnormal muscle tone and spasticity, prevent the occurrence of skeletal deformities and reduce the occurrence of pressure sores.

8. As noted in this report, "standing is an effective way to counterbalance many of the negative effects of constant sitting" The medical benefits of standing are achieved by:

   * Allowing the wheelchair user to extend his or her hip and knee joints in order to decrease the development of contractures in the lower extremities;

   * Providing better alignment of the spine and extension of the upper trunk, resulting in reduced pressure on the wheelchair user's internal organs, and avoiding the onset of respiratory complications often experienced by prolonged sitting in a wheelchair.

   * Allowing a wheelchair user to more completely empty his or her bladder, thus decreasing the onset of hypercalcemia and urinary tract and kidney infections.

   * Reducing the occurrence of chronic constipation, which can lead to bowel obstruction.

   * Addressing the loss of bone mineral density, which causes osteoporosis and an increased risk of fractures.

   * Improving blood circulation in the lower extremities and reducing swelling in the lower extremities.

   * Aiding in the reduction of excess muscle tone and muscle spasticity to reduce pain, improve comfort and function, and minimize loss in range of motion.

000294

- Providing complete pressure relief on the ischial tuberosities, which can decrease the occurrence of pressure ulcers.

9. A wheelchair with integrated stander enables the user to independently move from a sitting position to standing through gradual angle changes and allows him or her to obtain full upright or partially tilted positions to address the many adverse secondary medical complications that result from prolonged sitting.

10. The standing feature of the Permobil C500 can be used while the wheelchair is stationary or while moving at low speeds. It provides numerous opportunities for dynamic loading of the lower extremities and is more effective in reducing the risk of loss of bone mineral density (BMD) as well as promoting improvement in BMD. As stated in the RESNA report, "integrated standers allow for standing nearly any time for any length of time, and therefore weight loading is more likely to be of random distribution, which appears to be superior in BMD loss prevention."

11. Separate standers do not provide dynamic loading and are less effective in reducing the risk of bone loss than wheelchairs with integrated standing features. For some individuals, use of a separate stander requires one or more caregivers to assist with transferring the individual into the standing device. As a result, the wheelchair user's ability to stand is limited by the availability of assistance to transfer him or her into the equipment. In contrast, independent standing from one's own wheelchair decreases dependency on others, minimizes the risk of transfer injuries, and increases the opportunities for standing in multiple locations throughout the day, which has been shown to be more effective for physiological function (ex. BMD, Bowel/Bladder function/Gastrointestinal motility, Range of Motion/Spasticity management/Cardio-Respiratory function/etc.)

*Amy Morgan, Affiant*

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on the 27 day of August, 2013.

*Notary Public*

JESSICA LUCAS
Notary Public, Kentucky
State At Large
My Commission Expires
February 13, 2016
Notary ID# 460283

000295

# TAB 6



**BCM**

Baylor College of Medicine

**LISA R. WENZEL, M.D.**
Assistant Professor
Spinal Cord Injury Program
Physical Medicine & Rehabilitation

Date: September 26, 2013
Pt: Linda Puglisi
DOB: ~~██████████~~

## LETTER OF MEDICAL NECESSITY

To Whom It May Concern:

My name is Dr. Lisa Wenzel. I am an assistant professor of Physical Medicine and Rehabilitation at Baylor College of Medicine and a spinal cord injury attending at TIRR Memorial Hermann Hospital. I am also a member of the American Academy of Physical Medicine and Rehabilitation and the American Spinal Cord Injury Association.

In my position at TIRR Memorial Hermann Hospital, I am responsible for both the inpatient and outpatient care of individuals with spinal cord injuries, including management of such conditions as neurogenic bowel and bladder, pressure ulcers, spasticity, and neuropathic pain.

In February 2013, I was the attending physician for Linda at TIRR Memorial Hermann Hospital. During this inpatient stay, Linda underwent a comprehensive evaluation for a power wheelchair. As a result of this evaluation, we recommended a custom power wheelchair with an integrated standing feature for Linda. I provided the required attestation of medical necessity of the recommended power wheelchair on a form provided by Texas Medicaid.

I also provided additional medical support for the recommended wheelchair on May 9, 2013, in an earlier Letter of Medical Necessity. This letter explains the numerous secondary medical conditions Linda's faces due to her spinal cord injury and how these medical conditions can be managed by frequent independent standing throughout the day. The letter also explains that a separate stander is not equally effective in addressing these medical conditions and will not provide the same medical benefits for Linda.



**BCM**

Baylor College of Medicine

LISA R. WENZEL, M.D.
Assistant Professor
Spinal Cord Injury Program
Physical Medicine & Rehabilitation

The team responsible for conducting Linda's wheelchair evaluation in February 2013 continues to support their recommendation for a custom power wheelchair with integrated standing feature for Linda. The Permobil C500 VS is recommended to address Linda's medical needs and is not recommended for her convenience or the convenience of her caregivers.

Sincerely,

Lisa R. Wenzel, MD
Attending Physician
Physical Medicine and Rehabilitation
Spinal Cord Injury Program
TIRR/Memorial Hermann Hospital
Baylor College of Medicine

000288

# TAB 7

STATE OF NEW YORK
DEPARTMENT OF SOCIAL SERVICES

REQUEST July 24, 1992
PRIOR APPROVAL # none
CASE#    BJ701285
CENTER#  OHSM
FH#      1858518J

In the Matter of the Appeal of                    :

    Mary A                                         : DECISION
                                                   : AFTER
                                                   : FAIR
                                                   : HEARING

from a determination by the Office of Health
Systems Management of the New York State Department of :
Health (hereinafter referred to as the Agency or OHSM) :

---

JURISDICTION

    Pursuant to Section 22 of the New York State Social Services Law
(hereinafter Social Services Law) and Part 358 of the Regulations of the New
York State Department of Social Services (Title 18 NYCRR, hereinafter
Regulations), a fair hearing was held on September 16, 1992, in Dutchess
County, before Lewis J. Nestle, Administrative Law Judge.  The following
persons appeared at the hearing:

    For the Appellant

    Andrew Alter and Barbara Nectow (Mid-Hudson Legal Services), Appellant's
    Representative

    For the Office of Health Systems Management

    Submitted, personal appearance waived.

ISSUE

    Was the Agency's determination not to process the Appellant's vendor,
Daves Wheelchair, Inc.'s prior approval request correct?

FACT FINDING

    An opportunity to be heard having been afforded to all interested
parties and evidence having been taken and due deliberation having been had,
it is hereby found that:

    1.   The Appellant has been in receipt of a Medical Assistance
authorization.  The Appellant is also eligible for Medicare benefits.

    2.   On June 25, 1992, the Appellant's vendor, Daves Wheelchair, Inc.
requested prior approval for an Avant wheeled walker for the Appellant.

    3.   On June 26, 1992, the Agency determined to return the Appellant's
vendor, Daves Wheelchair, Inc.'s prior approval request on the grounds that
the vendor must bill Medicare first.

4.   On July 24, 1992, the Appellant requested this fair hearing.

APPLICABLE LAW

Section 365-a of the Social Services Law provides in part:

2.   "Medical Assistance" shall mean payment of part or all of the cost of medically necessary medical, dental and remedial care, services and supplies, as authorized by this title or the regulations of the department, which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with such person's capacity for normal activity, or threaten some significant handicap and which are furnished an eligible person in accordance with this title and the regulations of the department.

Section 364.2 of the Social Services Law provides in part, as follows:

The department of health shall be responsible for . . .

(b)  establishing and maintaining standards for all non-institutional health care and services rendered pursuant to this title, . . .

*       *       *

Section 2.1.4 of the New York State Medicaid Management Information System (MMIS) Durable Medical Equipment Provider Manual defines prior approval as the process of evaluating the aspects of a plan of care which may be for a single service or an ongoing series of services in order to determine the medical necessity and appropriateness of the care requested.

Section 2.2.2.B. of the MMIS Durable Medical Equipment Provider Manual and, effective February 20, 1991, Department Regulations at 18 NYCRR 505.5(a)(1) define "Durable Medical Equipment" as:

devices and equipment, other than prosthetic or orthotic appliances, which have been ordered by a qualified practitioner in the treatment of a specific medical condition and which have all of the following characteristics:

-   Can withstand repeated use for a protracted period of time;

-   Are primarily and customarily used for medical purposes;

-   Are generally not useful to a person in the absence of an illness or injury; and

-   Are usually not fitted, designed or fashioned for a particular individual's use.

-   Where equipment is intended for use by only one patient, it may be either custom made, or customized.

"Custom-made" means fabricated solely for a particular individual and cannot be readily changed to conform to another recipient's needs. It usually requires the recipient to be measured for custom fitting and/or molding of components.

"Customized" refers to a stock item that has modifications made and/or attached (to it) to meet a recipient's needs. These modifications may be changed (by adding or deleting items such as armrests, etc.) to return the item to stock.

Section 360-7.2 of the Department's Regulations provides:

> Where a third party, such as a health insurer or responsible person, has a legal liability to pay for MA-covered services on behalf of a recipient, the department or social services district will pay only the amount by which the MA reimbursement rate for the services exceeds the amount of the third party liability. The department or social services district will also pay if the third party payment will not be made within a reasonable time. The department or social services district will seek reimbursement for any payments for care and services it makes for which a third party is legally responsible. They will seek reimbursement to the extent of the third party's legal liability unless the amount reasonably expected to be recovered is less than the cost of making the recovery.

Section 360-7.3 of the Department's Regulations provides for the use of health, hospital or accident insurance. A recipient must use health, hospital or accident insurance benefits to the fullest extent in meeting his/her medical needs.

Section 2.2.12f of the MMIS Provider Manual states, in part:

> When a procedure requires prior approval, prior approval must be obtained by the provider when a recipient has both Medicare and Medicaid coverage in order to receive Medicaid payment for Medicare deductibles and coinsurances except when the request involves rentals...

## DISCUSSION

It should initially be noted that the Agency had requested a waiver of personal appearance which was opposed by the Appellant's counsel. The material in support of the request and in opposition to the request was carefully reviewed and it was determined that the waiver would be granted because of the absence of any factual issues. The matter was discussed at the hearing and the Appellant's Representative elected to proceed with the hearing in the absence of the Agency.

The Appellant receives both Medicare and Medical Assistance benefits. The Agency, in its submission, contended that the Appellant was required to explore Medicare approval first because the Medical Assistance Program is the payor of last resort.

The Agency's contention is not persuasive. The issue here is a request for prior approval, not a request for payment. Although the Medical Assistance Program is the payor of last resort, the question of payment is not relevant to the issue of prior approval. Section 2.1.7 of the Manual states that payment will not be made for medical care and services for which third parties e.g., Medicare are liable. Similarly, Section 2.1.9 of the Manual speaks to the provider's responsibility to bill all applicable insurance sources before submitted a claim for payment under the Medical Assistance Program. However, the Appellant is entitled to have the Agency determine whether the walker is medically necessary which is a separate and distinct question from the amount of Medical Assistance payment, if any. Under these circumstances, the Agency will be required to process the Appellant's request for prior approval and determine the medical necessity of the walker.

The Appellant's Representatives requested that the question of medical necessity be resolved at this hearing and submitted a copy of a letter dated June 15, 1992 from the MS Comprehensive Care Center in support of the request. This request is denied. The Agency summary indicated that the Agency had granted prior approval to make repairs to the Appellant's wheelchair. As set forth in the cited legal authority, it is the Agency's responsibility to determine medical necessity for the purchase of durable medical equipment. Under these circumstances, the appropriate remedy when there has been an improper failure to act or when the Agency has returned a prior approval request for an improper reason, is to require the Agency to process the request and to make a determination.

The Appellant's Representatives further contended that the rate of reimbursement set forth in the MMIS Provider Manual in this type of situation is contrary to federal law. The Manual provides that reimbursement is the lesser of the difference between what Medicare pays and the Medicare approved amount (the co-pay) or what Medicare pays and the Medical Assistance rate. The Appellant's Representative contended that this limitation violates federal Title XIX requirements regarding amount, scope and duration of benefits and that a similar policy had been enjoined in California. However, inasmuch as no determination has been made as to prior approval of the walker, it would be premature to address the question as to the amount of payment in this decision.

DECISION AND ORDER

The determination of the Agency not to process the Appellant's vendor, Daves Wheelchair, Inc.'s prior approval request is not correct and is reversed.

The Agency is directed to determine whether the Avant wheel walker is medically necessary and to advise the Appellant and her Representative of its determination.

.As required by Department Regulations at 18 NYCRR 358-6.4, the Agency must comply immediately with the directives set forth above.

DATED:  Albany, New York

OCT 0 1 1992

NEW YORK STATE DEPARTMENT
OF SOCIAL SERVICES

By

Commissioner's Designee

# TAB 8

## 1565  Agency Action Notice Issues
Revision 11-4; Effective June 1, 2011

Whenever an adverse action is taken, programs are required to send an adequate notice to the client. Federal law sets out what is to be included in adverse action notices. If the appellant raises an issue at the hearing questioning the sufficiency of the notice, the hearings officer must address the issue at that time. The hearings officer may direct the agency to send a corrected notice, in accordance with all legal requirements. The appellant may choose to waive any notice issues and continue with the hearing.

Notices are of particular importance in nursing facility discharge hearings and in Personal Care Service hearings and adequacy of the notices must be addressed as an issue within the hearing in addition to other issues listed as the basis for the intended adverse action. In these appeals, if the notice issue is not raised by the appellant, the hearings officer must develop the record to include information to determine the legal adequacy of the notice.

## 1565.1  When Appellant Raises a Notice Issue

Revision 10-1; Effective January 15, 2010

If the appellant raises a notice issue, either directly or indirectly, it must be dealt with by the hearings officer on the record. The appellant has the right to receive adequate notice. However, the appellant can waive any notice issues and continue with the hearing. It is the hearings officer's responsibility to establish if the appellant wants to waive any issues on adequate notice. If the appellant waives any notice issue, then the hearing can proceed and notice is no longer an issue.

If the hearings officer determines that the notice is not adequate and appellant does not waive his right to receive adequate notice, the hearings officer instructs the agency representative to prepare a new notice and provide it to the appellant. After the new notice is provided, the hearings officer reconvenes the hearing.

Notice issues raised and how they were resolved should be noted in the hearings officer's decision under Procedural History.